19. To approve any Distributions, to the extent necessary, or objections thereto, under the Plan.

20. To approve any Claims settlement entered into or offset exercised by the Debtor.

21. To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order, or as may be authorized under provisions of the Bankruptcy Code.

22. To enter a Final Order or orders closing the Chapter 11 Case.

**Failure of the Bankruptcy Court to Exercise Jurisdiction**. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, then Article 11.1 hereof shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**Governing Law**. Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal laws apply, the rights and obligations arising under the Plan shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law, *provided, however*, that in respect to any executory contract that shall have been assumed by the Debtor and in respect to the KeyBank Loan Documentation,

the YA Global Loan Documentation and the True Value Loan Documentation, the governing law shall be as stated in such contract or documents, if applicable.

**<u>Amendments</u>.**

**Pre-confirmation Amendment.** Subject to the written consent of YA Global and True Value, the Debtor may modify the Plan at any time prior to the entry of the Confirmation Order, *provided, however,* that the Plan, as modified, and the Disclosure Statement pertaining thereto meet applicable Bankruptcy Code requirements.

**Post-confirmation Amendment Not Requiring Resolicitation.** After the entry of the Confirmation Order, the Debtor may modify the Plan to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, or in a manner that does not materially adversely affect the interests, rights, treatment or Distributions of a Class of Claims or Interests, *provided, however,* that the Debtor obtains approval of the Bankruptcy Court for such modification.

**Post-confirmation/Pre-consummation Amendment Requiring Resolicitation.** After the Confirmation Date and before substantial consummation of the Plan, the Debtor may modify the Plan in a way that materially and adversely affects the interests, rights, treatment, or Distributions of a class of Claims or Interests, *provided, however,* that: (i) the Plan, as modified, meets applicable Bankruptcy Code requirements; (ii) the Debtor obtains Bankruptcy Court approval for such

modification; (iii) such modification is accepted by the holders of at least two-thirds in amount, and more than one-half in number, of Allowed Claims or Interests voting in each class affected by such modification; (iv) YA Global and True Value consent to the modification, and (v) the Debtor complies with section 1125 of the Bankruptcy Code with respect to the Plan as modified.

**Modification, Revocation or Withdrawal of the Plan.** The Debtor reserves the right to modify or revoke and withdraw the Plan as the plan of reorganization for the Debtor at any time before the Confirmation Date or, if the Debtor is for any reason unable to consummate the Plan after the Confirmation Date, at any time up to the Effective Date.

**Exemption from Certain Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code: (i) the issuance, transfer or exchange of any securities, instruments or documents; (ii) the creation of any other lien, mortgage, deed of trust or other security interest; or (iii) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with the Plan or the sale of any assets of the Debtor, and any deeds, bills of sale or assignments executed in connection with the Plan or the Confirmation Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for or allowable under section 1146(a) of the Bankruptcy Code. For purposes of this provision

of the Plan, the sale or transfer of any of the Properties, as defined above, shall be governed by this sub-section of the Plan.

**Compromise of Controversies.** Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness. The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

**Statutory Fees.** All fees arising on or prior to the Effective Date and payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court or otherwise, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid by the reorganized Debtor.

**Insurance Preservation and Proceeds.** Nothing in the Plan shall diminish or impair the enforceability of any policies of insurance that may cover Claims

against the Estate, the Debtor or any related Person. Holders of Claims which are eligible to be satisfied, in whole or in part, through any such policy shall be obligated, as a condition to receiving any Distributions under the Plan, to seek recovery or assist the Debtor in seeking recovery under such policies with regard to such Claims.

**Successors and Assigns.** The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

**Confirmation Order and Plan Control.** To the extent that the Confirmation Order and/or the Plan is inconsistent with the Disclosure Statement and/or any other agreement entered into between the Debtors and any party, the Plan controls the Disclosure Statement and any such agreements, and the Confirmation Order controls the Plan.

**Notices.** All notices or requests in connection with the Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

Antonucci Law Firm LLP
David P. Antonucci, Esq.
12 Public Square
Watertown, NY 13601
(315) 788-7300

**No Admissions.** Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtor or any other party with

respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of a Claim's classification.

## CONCLUSION

The Debtor urges all holders of Claims to accept the Plan because the Plan will provide an opportunity for such holders to receive payment in full on their claims. The Debtor affirms that each of the provisions and terms of the Plan have been reviewed by the Debtor and its sole officer, director and shareholder. That each such party has found the Plan to be fair, reasonable and feasible and as such management of Debtor has been authorized by the sole officer, director and shareholder to file the accompanying proposed plan of reorganization of the debtor.

Dated: October 13, 2010

Respectfully submitted

Antonucci Law Firm LLP

By:____________________
David P. Antonucci Esq.
Bar Roll No. 101041
Attorneys for Debtor
Office and P.O. Address
12 Public Square
Watertown, New York 13601

Patrick Hackett Hardware Company

By:____________________
Hebert Becker, President

EXHIBIT A

LENDING DOCUMENTS



TANGIERS
CAPITAL, LLC
[illegible]
[illegible]
www.tangierscapital.com

## *Equity Line of Credit Term Sheet*

**Company:** **Wisebuys, Inc. (stock symbol: HCKI)**

**Commitment Amount:** Tangiers Investors, LP (the "Purchaser") shall commit to purchase up to ten million dollars ($10,000,000) of HCKI common stock (the "Common Stock") from time to time over the course of twenty-four months (24) after an effective registration of the shares (the "Contract Period"). This commitment is predicated upon HCKI continuing to be publicly traded on the Over the Counter Bulletin Board exchange and filing of the requisite SEC Registration Statement.

**Put:** The Company is entitled to request an equity investment by the Purchaser during the Contract Period, pursuant to which the Company will issue Common Stock to the Purchaser with an aggregate Purchase Price equal to the equity investment, subject to the Market Price.

**Put Restrictions:** There will be a minimum of ten (10) trading days between Puts. This restriction may be temporarily removed with written approval from the Purchaser.

**Put Amounts:** The timing and amounts of the "Puts" shall be at the discretion of the Company. The maximum dollar amount of each Put will be equal to the average daily trading volume in dollar amount of the lowest five (5) daily volume weighted average during the ten (10) trading days preceding the Put Date. No Put will be made in amount lower than five thousand dollars ($5,000) or higher than one hundred thousand dollars ($100,000).

**Put Date:** Date on which Purchaser receives Put Notice requesting a draw down by the Company for a portion of the Equity Sum.

**Market Price:** The lowest daily volume weighted average price of HCKI Common Stock during the Pricing Period.

**Pricing Period:** The five (5) consecutive trading days including and immediately following the date on which the applicable Put Notice is delivered to the Purchaser.

**Formula Price:** The lowest daily volume weighted average price of HCKI Common Stock during the fifteen (15) business days immediately preceding the day a commitment fee tranche is due to be issued.

**Purchase Price:** The Purchase Price shall be set at eighty percent (80%) of the Market Price.

**Floor Price:** No purchases shall take place below a mutually agreed upon floor price (optional).



TANGIERS
CAPITAL, LLC
402 W. Broadway Ste. 400 San Diego, CA 92101 phone: 619.615.4255 fax: 619.500.2011
www.tangierscapital.com

**Agreement Regarding Proceeds:** The Company agrees that the Purchaser may deliver the proceeds underlying the convertible debenture, in the amounts set forth above, directly to the Company's professional service providers instead of delivering such proceeds to the Company. To that end, the Company shall provide the Purchaser with the contact information for each of its professional service providers who will receive the proceeds from the convertible debenture.

**Short Selling:** The Purchaser is committed not to engage in any short selling of the Common Stock of HCKI during the Contract Period.

**Settlement Date:** The first (1st) trading day after each Pricing Period. On each Settlement Date, the Company will cause the delivery of the Common Stock to the Purchaser or its designees via Deposit/Withdrawal at Custodian ("DWAC"), against payment therefore to the Company's designated account by wire transfer of immediately available funds (provided that the shares of stock are received by the Purchaser no later than 09:30 am EST) or next day available funds if the shares are received thereafter.

**Commitment Fee:** Upon the date of execution of the Securities Purchase Agreement, the Company shall be required to issue the Purchaser five hundred thousand dollars ($500,000) worth of restricted Common Stock as a commitment fee. The number of shares will be determined based on the division of the dollar value of the Commitment Fee by the Formula Price. Tangiers will, at any time prior to the issuance of a commitment fee tranche, have the option to delay the issuance of stock by 30 day increments in response to potential ownership threshold issues. The commitment fee shares shall have piggyback registration rights and shall be issued in tranches in accordance with the following schedule:

1) $100,000 worth of Common Stock shall be issued upon the execution of the Securities Purchase Agreement (Tranche #1)

2) $200,000 shall be issued when the Company's S-1 Registration Statement is declared effective by the SEC (Tranche #2)

3) $200,000 shall be issued 90 days after the Company's S-1 Registration Statement is declared effective by the SEC (Tranche #3)

**Registration:** Within thirty (30) days after definitive financing documents are executed the Company agrees to use its best efforts to file with the SEC a registration statement covering the shares of stock underlying the equity line of credit. Such registration statement shall conform to the requirements of the rules and regulations of the SEC and the terms and conditions of the equity line as expressed in the registration statement shall be reviewed and approved by the Purchaser.



TANGIERS
CAPITAL, LLC

402 W Broadway Ste 400 San Diego CA 92101 phone 619.615.4255 fax 619.564.2011
www.tangierscapital.com

**Effectiveness:** The Company will take any and all necessary action to have its registration statement declared effective by the SEC within 30 days but no more than 90 days after the Company has filed its registration statement.

**Exclusivity Clause:** The Company shall not pursue a similar equity line transaction with any other party unless and until good faith negotiations have terminated between the Purchaser and the Company or until such time as the registration statement has been declared effective by the SEC.

*(Signature Page Follows)*



*This Term Sheet has been prepared for discussion purposes only. It is an indication of interest only, not an offer to sell or buy securities, and is non-binding on the parties pending execution of a definitive agreement. Execution of a definitive agreement will be subject to the satisfactory completion of the Purchaser's due diligence.*

***This Term Sheet will be considered null and void if it is not executed by both parties by the close of business five (5) business days after the date hereof.***

Wisebuys, Inc.

By: [signature]

Name: Tom Sweetner its President

Tangiers Investors, LP

By: [signature]

Name: Michael Sobeck

Managing Member of the General Partner, Tangiers Capital, LLC

**EXHIBIT "B"**

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR THE SECURITIES LAWS OF ANY STATE.**

**THE ACQUISITION OF THE SECURITIES OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.**

ENTITY SUBSCRIPTION AGREEMENT – COMMON STOCK

Ladies and Gentlemen:

Quantum Asset Partners. LLC (the "Shareholder") acknowledges that WiseBuys, Inc., a Florida Corporation, (the "COMPANY") is offering for sale 172,000,000 shares of Common Stock ("Shares") for an aggregate purchase price of Forty Three Thousand Dollars ($43,000.00) (the Shares are referred to as the "Securities"). The Shareholder further acknowledges that the issuance of the Shares is part of a private offering by THE COMPANY (the "Offering") that is being made without registration of the Shares under the Securities Act of 1933, as amended (the "Securities Act"), and is being made only to "accredited investors," (as such term is defined in as defined in the rules to the Securities Act of 1933, as amended) pursuant to Regulation D, Rule 504 and Sections 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations pursuant to the Delaware Securities Act.

1. Subscription. Subject to the terms and conditions hereof, the undersigned hereby irrevocably subscribes to the Shares in the amount set forth in the Investor Grid dated the same date herewith, which amount is payable as described in Section 4 hereof. Company is offering the Shares to Shareholder at a fifty percent (50%) discount of the last market bid price. The issue price shall be $.00025 per share.

2. Acceptance of Subscription and Issuance of Shares. It is understood and agreed that THE COMPANY shall have the sole right, at its complete discretion, to accept or reject this subscription, in whole or in part, for any reason and that the same shall be deemed to be accepted by THE COMPANY only when it is signed by a duly authorized officer of THE COMPANY, and delivered to the undersigned. Subscriptions do not need to be accepted in the order received, and the Shares may be allocated among subscribers. Notwithstanding anything in this Subscription Agreement (the "Agreement") to the contrary, THE COMPANY shall have no obligation to issue Shares to any person who is a resident of a jurisdiction in which the issuance of the Shares to it would constitute a violation of the securities, "blue sky" or other similar laws of such jurisdiction (collectively referred to as the "State Securities Laws"). It is intended that the Shares will only be issued to entities formed pursuant to the laws of the State of Delaware that maintain its principal place of business within the State of Delaware.

3. The Closing. The closing of the issuance of each of the Shares sold shall take place at the discretion of THE COMPANY and at such other time and place as THE COMPANY shall designate by notice to the undersigned (each, a "Closing").

4. Payment for Shares. Payment for the Shares shall be received by THE COMPANY from the Shareholder by wire transfer of immediately available funds upon delivery of the Shares to the undersigned, in an amount of and as set forth in Appendix A hereto. THE COMPANY shall deliver the Shares, issued by THE COMPANY, to the undersigned following the Closing for such Shares.

5. Representations, Warranties and Covenants of the Undersigned. The undersigned hereby represents and warrants to and covenants with THE COMPANY and each officer, director, and agent of THE COMPANY that:

   a. General.

      i. The undersigned has all requisite authority to enter into this Agreement and to perform all the obligations required to be performed by the undersigned hereunder.

    ii. The Shareholder is an entity formed pursuant to the laws of the State of Delaware and maintains its principal place of business within the State of Delaware and/or the undersigned is an "accredited investor" as defined under Rule 501 of Regulation D and/or the Subscriber is an "institutional investor" as defined under Sections 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.

iii. Each owner or member of the undersigned is an "accredited investor" as such term is defined in the rules to the Securities Act of 1933, as amended.

iv. The Shareholder will not engage in any activity that will constitute a distribution of the Shares and will not violate Regulation M or any other federal or state securities laws. The undersigned is experienced in such matters and understands the applicable laws and regulations.

b. Information Concerning THE COMPANY.

i. The undersigned understands that the investment in THE COMPANY through the Shares involves various risks.

ii. The undersigned understands that no federal or state agency has passed upon the Shares or made any finding or determination concerning the fairness or advisability of this investment.

iii. The Company represents and warrants that, as of the date of this Agreement, (i) the Company is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Act of 1934, as amended (the "1934 Act"), (ii) the Company is not an investment company or a developmental stage company that either has no specific business plan or purpose, (iii) the Company has not sold securities pursuant to exemption under Rule 504 within the past twelve (12) calendar months in an aggregate dollar amount that would preclude the contemplated sales of Shares under that rule, (iv) the Company is otherwise in compliance with the requirements of Rule 504 of Regulation D with respect to the offerings contemplated hereby, and (v) the Company is able to and does hereby offer and sell the Shares only to "accredited investors" in accordance with the provisions of Rule 504 and applicable state law.

c. Status of Undersigned. The undersigned is an "accredited investor," as such term is defined in as defined in the rules to the Securities Act of 1933, as amended.

d. Restrictions on Transfer or Sale of Securities.

i. The undersigned has not offered or sold any portion of the Shares to others or with a view to reselling or otherwise disposing of any portion of the Shares.

ii. The undersigned acknowledges that THE COMPANY has the right in its sole and absolute discretion to abandon this Offering at any time prior to the Closing and to return the previously paid subscription amount as set forth in Appendix A hereto without interest or penalty thereon, to the undersigned.

6. Conditions to Obligations of the Undersigned and THE COMPANY. The obligations of the undersigned to purchase and pay for the Shares specified in Appendix A hereto and of THE COMPANY to issue the Shares are subject to the satisfaction at or prior to the Closing of the sale of each Share of the following conditions precedent: (i) the representations and warranties of the undersigned contained in Section 5 hereof, shall be true and correct on and as of the Closing in all respects with the same effect as though such representations and warranties had been made on and as of the Closing; and (ii) the undersigned shall complete, execute and deliver this Agreement and all documents contemplated hereby and provided for herein and shall have deposited the full purchase price for the Shares to the Company in accordance with Section 4 above.



7. Brokers or Finder's Fees. Neither Party hereto has entered into any agreement to pay any broker's or finder's fee to any third party with respect to this Agreement or the transactions contemplated hereby. The undersigned and THE COMPANY shall indemnify and hold each other harmless against any losses, claims, damages, liabilities or actions to which the other may become subject arising out of or based upon any broker's or finder's fees which are not the fault of such other party.

8. Waiver; Amendment. Neither this Agreement nor any provisions hereof shall be modified, amended, discharged or terminated except by an instrument in writing, signed by the party against whom any modification, amendment, discharge or termination is sought. Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same on any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

9. Assignability. Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by THE COMPANY (except to a subsidiary or parent entity of THE COMPANY) or the undersigned without the prior written consent of the other parties to this Agreement.

10. Governing Law. THIS AGREEMENT SHALL BE CONSTRUED, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER DETERMINED, IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULE THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE INTERNAL LAWS OF THE STATE OF DELAWARE TO THE RIGHTS AND DUTIES OF THE PARTIES; PROVIDED, HOWEVER, THAT ALL LAWS PERTAINING OR RELATING TO CORPORATE GOVERNANCE OF THE COMPANY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULE THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE INTERNAL LAWS OF THE STATE OF DELAWARE TO THE CORPORATE GOVERNANCE OF THE COMPANY.

11. Section and Other Headings. The section and other headings contained in this Agreement are for reference *purposes only and shall not affect the meaning or interpretation of this Agreement.*

12. Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

13. Notices. All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid to the Company and the undersigned, to them at the addresses set forth on the signature page hereto; or at such other address as either party shall have specified by notice in writing to the other.

14. Binding Effect. The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

15. Survival. All representations, warranties and covenants contained in this Agreement shall survive (i) the acceptance of the subscription by THE COMPANY, (ii) changes in the transactions, documents and instruments described herein which are not material or which are to the benefit of the undersigned, and (iii) the death or disability of the undersigned.

16. Notification of Changes. The undersigned hereby covenants and agrees to notify THE COMPANY upon the occurrence of any event prior to the Closing pursuant to this Agreement which would cause any representation, warranty, or covenant of the undersigned contained in this Agreement to be false or incorrect.



17. Entire Agreement. This Agreement, including any appendices attached hereto, supersede all prior discussions and agreements among the parties hereto with respect to the subject matter hereof and thereof and contain the and entire agreement among the parties hereto with respect to the subject matter hereof and thereof.

18. Expenses; Attorneys Fees. Except as otherwise expressly set forth herein, each party shall pay all expenses incurred by it or on its behalf in connection with this Agreement or any transaction contemplated hereby.

19. Further Assurances. Each party hereto shall execute and deliver such additional documents as may be necessary or desirable to consummate the transactions contemplated by this Agreement.

20. Severability. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Agreement this 16th day of September, 2010.

**NAME OF INVESTOR:**

Quantum Asset Partners, LLC
A Delaware LLC
874 Walker Road, Suite C
Dover, DE 19904

**EIN# of Company:** 27-2423532

| | |
|---|---|
| Investment Amount: | $43,000.00 |
| Total # Free-trading Shares: | 172,000,000 |

**Mailing Address for Stock Certificate:**
Quantum Asset Partners, LLC
A Delaware LLC
874 Walker Road, Suite C
Dover, DE 19904

**Certificate issued in the name of:** Quantum Asset Partners, LLC

**IN WITNESS WHEREOF, the undersigned has executed this Agreement this 17th day of September, 2010**

QUANTUM ASSET PARTNERS, LLC

By: ______________________
Shawn Rhynes
Managing Director

WISEBUYS, Inc.

By: ______________________
Thomas Scozzafava
President

17. Entire Agreement. This Agreement, including any appendices attached hereto, supersede all prior discussions and agreements among the parties hereto with respect to the subject matter hereof and thereof and contain the and entire agreement among the parties hereto with respect to the subject matter hereof and thereof.

18. Expenses; Attorneys Fees. Except as otherwise expressly set forth herein, each party shall pay all expenses incurred by it or on its behalf in connection with this Agreement or any transaction contemplated hereby.

19. Further Assurances. Each party hereto shall execute and deliver such additional documents as may be necessary or desirable to consummate the transactions contemplated by this Agreement.

20. Severability. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Agreement this 16th day of September, 2010.

**NAME OF INVESTOR:**

Quantum Asset Partners, LLC
A Delaware LLC
874 Walker Road, Suite C
Dover, DE 19904

**EIN# of Company:** 27-2423532

| Investment Amount: | $43,000.00 |
|---|---|
| Total # Free-trading Shares: | 172,000,000 |

**Mailing Address for Stock Certificate:**
Quantum Asset Partners, LLC
A Delaware LLC
874 Walker Road, Suite C
Dover, DE 19904

**Certificate issued in the name of:** Quantum Asset Partners, LLC

**IN WITNESS WHEREOF, the undersigned has executed this Agreement this 17th day of September, 2010**

QUANTUM ASSET PARTNERS, LLC

By: ______________________
Shawn Rhynes
Managing Director

WISEBUYS, Inc.

By: ______________________
Thomas Scozzafava
President

**EXHIBIT "C"**



CUSIP 977271 10 5

# WISEBUYS, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF FLORIDA

COMMON STOCK

SEE REVERSE FOR CERTAIN DEFINITIONS

This certifies that

001957
QUANTUM ASSET PARTNERS, LLC

*ONE HUNDRED SEVENTY-TWO MILLION Shares of WISEBUYS, INC.*

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK, $0.01 PAR VALUE, OF
**WISEBUYS, INC.**

(hereinafter called the "Corporation"), transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney, upon surrender of the Certificate properly endorsed. This certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Articles of Incorporation, as amended, and the Bylaws of the Corporation, as amended (copies of which are on file at the office of the Transfer Agent), to all of which the holder of this Certificate by acceptance hereof assents. This Certificate is not valid unless countersigned and registered by the Transfer Agent and Registrar. Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

DATE: SEPTEMBER 17TH, 2010

PRESIDENT

SECRETARY

*Countersigned:*
SECURITIES TRANSFER CORPORATION
P.O. Box 701629
Dallas, Tx. 75370

By: TRANSFER AGENT - AUTHORIZED SIGNATURE

# WISEBUYS, INC.

TRANSFER FEE $30.00 PER NEW CERTIFICATE ISSUED

A FULL STATEMENT OF THE RELATIVE RIGHTS, INTERESTS, PREFERENCES AND RESTRICTIONS OF EACH CLASS OF STOCK WILL BE FURNISHED BY THE CORPORATION TO ANY SHAREHOLDER UPON WRITTEN REQUEST, WITHOUT CHARGE.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common
TEN ENT - as tenants by the entireties
JT TEN - as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT - ................Custodian................
(Cust) (Minor)
under Uniform Gifts to Minors
Act..............................................
(State)

Additional abbreviations may also be used though not in the above list.

*For value received*.............................................*hereby sell assign and transfer unto*

Please insert Social Security or other identifying number of assignee

[ ] ........................................................................

........................................................................

Please print or typewrite name and address including postal zip code of assignee

........................................................................

........................................................................

........................................................................*Shares*

*of the Common Stock represented by the within Certificate and do hereby irrevocably constitute and appoint*........................................................................

........................................................................

Attorney to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.

Dated................, 20........

Signature:

X........................................................................

X........................................................................

X NOTICE: The signature to this assignment must correspond with the name as written upon the face of the Certificate, in every particular, without alteration or enlargement, or any change whatever.

Signature Guarantee:

THE SIGNATURE(S) SHOULD BE MEDALLION STAMP GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION PURSUANT TO S.E.C. RULE 17AD-15.

Signature(s) guaranteed by:

**EXHIBIT "D"**

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this *"Agreement"*) is made and entered into as of the 28th day of July, 2010 (the *"Effective Date"*) by and between **ACG CONSULTING, LLC**, an Alabama limited liability company (the *"Consultant"*), and **SEAWAY VALLEY CAPITAL CORPORATION**, a Delaware Corporation (the *"Client"*) (Client and Consultant collectively the *"Parties"*). **SEAWAY CAPITAL PARTNERS, LLC**, a Delaware limited liability company, (*"SCP"*) is joining in this Agreement solely for the purpose of consenting to and guaranteeing the performance of its obligations set forth in Section 2.32 and Section 4.1 hereof for and in consideration of a forty nine percent (49%) ownership interest in the owner entity of the Regional Center as set for in Section 2.1.1 hereof.

## RECITALS

A. Consultant is a limited liability company organized for the purposes, *inter alia*, of developing and providing economic research and consultation services to the public. Consultant possesses specialized expertise in the employment based EB-5 visa program administered by the United States Citizenship and Immigration Services (*"USCIS"*) under the Immigration Act of 1990, as amended (the *"EB-5 Program"*). CONSULTANT (i) IS NOT A BROKER/DEALER, (ii) DOES NOT RAISE CAPITAL, AND (iii) DOES NOT PROVIDE LEGAL SERVICES OR LEGAL ADVICE.

B. Client is a Delaware corporation that owns, controls, is an affiliate of, or is the agent for various businesses that are desirous of obtaining funding from foreign national investors pursuant to the provisions for *Troubled Business, Expansion of Existing Business*, and/or a *New Commercial Enterprise* under EB-5 Program. The following are some of such businesses: **(i) WiseBuys Stores, Inc.** (*"WiseBuys"*) which began operations in 2003. WiseBuys initially focused on serving the "discount" retail needs of rural communities throughout northern and central New York. WiseBuys' later partnered with established and successful specialty discounters to create a "mall without the walls" concept, which resulted in a full line department store with quality products and competitive prices; **(ii) Harbor Brewing Company, Inc.** (*"Harbor Brewing"*) is the parent company of Sackets Harbor Brewing Company (*"SHBC"*), which develops, produces, and markets micro brewed beers such as the award winning "War of 1812 Amber Ale" and "Railroad Red Ale" as well as "Thousand Island Pale Ale", "1812 Amber Ale Light" and "Harbor Wheat" premium craft beers. Its "1812 Amber Ale" has been aggressively marketed to command a significant retail presence in over 3,000 retail locations. The company has also developed complementary products such as Sackets Harbor Coffee and Sackets Harbor Brewing Co. Root Beer; **(iii) Sackets Harbor Brew Pub, LLC** (*"Brew Pub"*) operates one of New York State's oldest continuing working microbreweries featuring both a working brewery and dining establishment. Located in Sackets Harbor, NY, the brewery occupies the former New York Central Railroad Station building and is situated on the shore of Lake Ontario, which provides expansive views of the lake and sunsets and offers fine dining and upscale pub fare that is paired with a rotating selection of over fifteen original craft beers brewed on-site; **(iv) Alteri Bakery, Inc.** (*"Alteri"*) has serviced the North Country region with quality baked goods since 1971. Alteri's is located in a state of the art baking facility in the heart of Watertown's business district, and is one of the last traditional Italian bakeries in the area. Alteri's produces the area's only "true" Italian breads and specialty pastry items, such as cakes, cookies, muffins, bagels, and specialty gift baskets. Alteri's products are retailed at local restaurants, grocery stores, schools, and its own store. In addition, Alteri's recently assumed the production approximately 2.5 million sub rolls for the entire Jreck Subs franchise chain; **(v) Patrick Hackett Hardware Company, Inc.** (*"Hackett's"*) is a full line department store specializing in name brand merchandise and full service hardware. At the time of the acquisition, Hackett's had locations in five towns in upstate New York. Each store features brand name clothing for men, women, and children, and a large selection of athletic, casual, and work footwear. Hackett's also carries domestics, home décor, gifts, seasonal merchandise, and sporting goods. Hackett's full service hardware department features traditional hardware, tool, plumbing, paint, and electrical departments; and **(vi) Pay at Scan** (*"Pay at Scan"*) is a startup computer software company. Client desires to create a new enterprise that will design, develop, and market a proprietary computer software system that will enable a retailer to pay for a portion of its inventory at the point of sale through an elaborate computer network and software, thereby enabling a retailer to

to have an expanded inventory on hand to sell without having the necessity of paying the wholesaler of the inventory goods in advance (the "*Proposed Projects*" and each a "*Proposed Project*").

**C.** Client wishes to engage Consultant to provide certain consulting services, advice, and assistance in obtaining *EB-5 Financing* for the Proposed Projects under the EB-5 Program from foreign nationals via subscription of foreign nationals to securities ("*Securities*") which will be offered and sold only to persons who are not citizens of the United States of America (the "*U.S.*") and who are physically located outside the U.S. in reliance upon Regulation S ("*Regulation S*") under the Securities Act of 1933, as amended (the "*Securities Act*").

**D.** Client wishes Consultant to obtain approval of USCIS for the designation of a regional center under the EB-5 Program that would include as its geographical area the states of **New York, Vermont and New Hampshire, Massachusetts and Connecticut** through which regional center Client proposes to obtain EB-5 Financing to facilitate the development of the Proposed Projects (the "*Regional Center*"). Client further wishes to seek preapproval of the Proposed Projects from USCIS upon approval of the Regional Center by USCIS.

**E.** Consultant wishes to provide such consulting services, advice, and assistance to Client in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be bound legally, do hereby covenant and agree as follows:

**1. Defined Words and Phrases.** Defined words and phrases are in italics the first time they appear and/or when they are defined. Except as otherwise specified, definitions are contained in Section 20 hereof.

**2. Consulting Services.** With the full cooperation of Client and to the extent Consultant deems necessary, appropriate, and/or feasible, in Consultant's sole discretion, Consultant agrees to familiarize itself with the business, operations, properties, financial condition, and the prospects of Client obtaining EB-5 Financing for the Proposed Projects.

Consultant agrees to provide the following consulting services, advice, and assistance (the "*Consulting Services*") to Client:

**2.1** Advice, Counsel and Assistance. Consultant agrees to provide advice, counsel, and assistance to Client directed toward the goal of obtaining EB-5 Financing for the Proposed Projects under the EB-5 Program. Such advice, counsel, and assistance, in cooperation with Client includes, *inter alia*, the following:

**2.1.1** on behalf of Client and for the benefit of Client, Consultant and SCP the filing of an application with USCIS for the creation of the Regional Center under the EB-5 Program through a to be formed special purpose entity (the "*SPE*"), which will be owned forty-nine percent (49%) by SCP and fifty-one percent (51%) by Consultant covering the states of New York, Vermont New Hampshire, Massachusetts and Connecticut as its geographical area. It being understood and agreed that the Regional Center, when approved by USCIS, will serve as a legal vehicle through which solicitations of investments from foreign nationals can be made in reliance of Regulation S under the Securities Act and the EB-5 Program to provide EB-5 Financing for the Proposed Projects; other projects of Client, Consultant, SCP, and of other parties seeking EB-5 Financing for their projects;

**2.1.2** upon obtaining the approval by USCIS of the Regional Center and Client's written request, the filing by Consultant, on behalf of Client, of a written request with USCIS seeking its preapproval of each of the Proposed Projects and its recognition that each of the Proposed Projects can reasonably be expected to create ten full-time direct, indirect, and/or induced jobs within a "reasonable time" period for each investment made by foreign investors in compliance with the EB-5 Program;

2.1.3 on behalf of Client, retaining the services of legal professionals and economists relative to the filing of the application for approval of the Regional Center and the pre-approval of the Proposed Projects under the EB-5 Program;

2.1.4 on behalf of Client, retaining and engaging the services of securities attorneys for the preparation of the requisite private placement memoranda and exhibits thereto so that the Securities may be offered to foreign nationals outside the United States under the EB-5 Program;

2.1.5 on behalf of Client, obtaining requisite econometric impact studies, reports and legal documents to be included in the application for approval of the Regional Center by USCIS;

2.1.6 making commercially reasonable efforts to assist Client in the introduction to, and engagement of, foreign immigration brokers, finders, and legal professionals through the Regional Center to raise capital for the Proposed Projects via subscription of foreign nationals to the Securities under the Securities Act and the EB-5 Program; and

2.1.7 assisting with the execution of a marketing strategy plan and a comprehensive budget directed toward Client's successful solicitation of purchasers of the Securities by foreign nationals physically located outside the United States.

2.2 Confidential Private Placement Memoranda. Upon obtaining approval of the Regional Center by USCIS and Client's written request, Consultant on behalf of Client, will cause to be prepared, various complete EB-5 compliant confidential private placement memoranda (the "*Memoranda*" and each a "*Memorandum*"), in order to offer and sell Securities only to non-U.S. persons in reliance upon Regulation S and pursuant to the EB-5 Program that will be directed toward raising the aggregate sum of THIRTY MILLION AND NO/100 DOLLARS ($30,000,000) as EB-5 Financing from foreign nationals outside the United States through foreign immigration brokers, finders, and legal professionals under the Securities Act and the EB-5 Program. Each Memorandum will describe Client's Proposed Projects, its operations, properties, financial condition, and prospects of the development of the subject Proposed Project.

With respect to any Memorandum prepared under this Agreement, the Parties acknowledge and agree as follows:

2.2.1 each Memorandum, in so far as it describes the subject Proposed Project and Client, shall be based entirely upon information supplied by Client, and Client hereby warrants and represents that the information supplied by Client or pertaining to Client shall be complete and accurate in all material respects, shall not be misleading, and shall not violate the anti-fraud provisions of the Securities Act;

2.2.2 from time to time, Client agrees to furnish Consultant with such additional information about Client and each of the Proposed Projects, the operations, business and financial condition such that the information about Client contained in the Memoranda shall be complete and accurate in all material respects and not be misleading and shall continue at all times to be complete and accurate in all material respects and not be misleading;

2.2.3 Consultant under any circumstance shall not be deemed to have been responsible for the accuracy and/or the completeness of any Memorandum in so far as it describes any of the Proposed Projects and Client; and

2.2.4 each Memorandum, when completed, shall not be used, reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose without the prior written consent of Consultant;

2.3 Marketing Budget. Consultant and Client agree as follows regarding the marketing services to be provided by Consultant:

2.3.1 the Parties hereby approve the initial marketing budget (the "*Initial Marketing Budget*") set forth in Exhibit A attached hereto and incorporated herein by reference. The Parties further acknowledge that the Initial Marketing Budget represents the agreement of the Parties with respect to the amount of its funding and the items for which the funds will be expended. Client agrees to fund the Initial Marketing Budget in an amount of not less than ONE HUNDRED TEN THOUSAND AND NO/100 DOLLARS ($110,000.00), which funding amount shall become due and payable in installments as follows: (i) a first payment in the amount of FORTY THOUSAND AND NO/100 DOLLARS ($40,000.00) shall become due and payable upon the occurrence of any successful raise of EB-5 Financing; (ii) a second payment in the amount of FORTY THOUSAND AND NO/100 DOLLARS ($40,000.00) shall become due and payable within thirty (30) days from the date on which the first payment is due to be paid; and (iii) a third payment in the amount of THIRTY THOUSAND AND NO/100 DOLLARS ($30,000.00) shall become due and payable within sixty (60) days from the date on which the first payment is due to be paid. The Initial Marketing Budget may be revised from time to time by written agreement of the Parties in the event the Initial Marketing Budget proves to be insufficient to pay the costs and expenses of the preparation of the Memoranda and the marketing of the Securities; and

2.3.2 the Parties acknowledge and agree (i) that the Securities will be offered and sold only to non-U.S. persons who are physically located outside the United States, and (ii) not to commit any act that would place in jeopardy the reliance upon Regulation S or would otherwise violate the laws of the United States or any other relevant foreign jurisdiction when marketing the Securities.

2.4 Due Diligence. Consultant may, but shall not be required to, undertake due diligence with respect to the proposed financial and business transactions involving Client and the Proposed Projects, including investigation and advice relating to the EB-5 Program or other financial programs for the benefit of Client.

2.5 Additional Services. Consultant may provide such further and additional services as is necessary to fulfill its engagement as may be mutually agreed upon in writing by the Parties.

2.6 Commercially Reasonable Efforts. Consultant represents and warrants that it will devote such time and commercially reasonable efforts as may be reasonably necessary to perform the services of Consultant under this Agreement. CLIENT EXPRESSLY ACKNOWLEDGES AND AGREES THAT CONSULTANT DOES NOT IN ANY MANNER WHATSOEVER GUARANTEE A POSITIVE RESULT CONCERNING (i) THE APPROVAL OF THE HEREIN CONTEMPLATED APPLICATION TO BE DESIGNATED AS A REGIONAL CENTER BY USCIS UNDER THE EB-5 PROGRAM; (ii) THE INVESTMENT BY FOREIGN NATIONALS OF CAPITAL INTO THE PROPOSED PROJECTS UNDER THE EB-5 PROGRAM, AND (iii) THE SUCCESSFUL CONSUMMATION OF ANY RAISE OF CAPITAL THROUGH THE SALE OF THE SECURITIES UNDER THE SECURITIES ACT AND THE EB-5 PROGRAM.

2.7 Limitation of Services.

2.7.1 It is expressly acknowledged that Consultant has not agreed with Client, in this Agreement or in any other agreement, verbal or written, to offer or sell any security, or be a market-maker or securities dealer in the offering of any security.

2.7.2 Any compensation paid to Consultant under this Agreement is not, and shall not be construed as, compensation for the offer or sale of any security or acting as a broker/dealer with respect to any offering of a security, or for the submission of an application to offer or make a market in any security.

2.7.3 Notwithstanding anything contained herein to the contrary, nothing hereunder shall obligate Consultant to make any minimum number of introductions of foreign immigration brokers, finders, and legal professionals to Client.

**2.8** Exclusive Right to Provide Consulting Services. Client hereby grants to Consultant the exclusive right to provide the Consulting Services to Client for the Proposed Projects, thereby enabling Consultant to receive the benefit of its bargain under this Agreement, subject only to Client achieving a certain milestone of success in obtaining EB-5 funds from the sale of the Securities as set forth in Exhibit B attached hereto and incorporated herein by reference.

If at any time during the Term of this Agreement, Client pursues any EB-5 funding for any project that is similar to the business of any of the Proposed Projects, Consultant shall have the exclusive right, but not the obligation, to provide similar consulting services to Client for similar compensation as is set forth in this Agreement for the Proposed Projects. In the event Client elects to pursue any EB-5 funding for any project that is similar to the business of the Proposed Projects, Client shall immediately give Consultant written notice of such action, whereupon Consultant shall have ten (10) Business Days in which to give Client written notice that Consultant is either (i) exercising its exclusive right to provide similar consulting services to Client for similar compensation as is set forth in this Agreement for the Proposed Projects, or (ii) declining to exercise its rights to provide similar consulting services to Client for similar compensation as is set forth in this Agreement for the Proposed Projects.

**3. Term.** The term of this Agreement shall be for ten (10) years commencing on the Effective Date hereof and terminating at twelve o'clock midnight on the day and date which is one day prior to the tenth (10th) anniversary hereof. Thereafter, this Agreement may be renewed for subsequent terms upon the written agreement of the Parties.

**4. Compensation.** As a material consideration for Consultant to incur the obligations of Consultant under this Agreement and as a material inducement for Consultant to execute and perform its obligations under this Agreement, Client and SCP hereby agree to compensate Consultant as follows:

**4.1** Cash Portion of the Consideration. SCP shall pay to Consultant the sum of ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,000.00) as the cash portion of the consideration (the *"Cash Portion of the Consideration"*) in exchange for its Forty Nine Percent (49%) ownership in the Regional Center. SCP shall pay the Cash Portion of the Consideration to Consultant as follows: (i) simultaneously with Consultant filing an application with USCIS seeking such agency's approval of the Regional Center, SCP shall pay to Consultant the sum of TWENTY FIVE THOUSAND AND NO/100 DOLLARS ($25,000.00) in cash as reimbursement for the cost of the econometric impact study and the initial Memorandum (the *"Initial Memorandum"*) advanced by Consultant; and (ii) executing and delivering to Consultant, under terms and conditions acceptable to Consultant, in its sole discretion, a convertible debenture (the *"Debenture"*) in favor of Consultant in the principal amount of ONE HUNDRED TWENTY FIVE THOUSAND AND NO/100 DOLLARS ($125,000.00) which amount represents the unpaid principal balance of the Cash Portion of the Compensation. The Debenture shall bear interest at the rate of Eight Percent (8%) and shall be applied to the principal amount of the Debenture. ACG shall have the right, at its election, from the date upon which the application is filed with USCIS for approval of the Regional Center and thereafter at any time to convert all or part of the outstanding and unpaid Cash Portion of the Compensation and accrued interest into shares of fully paid and non-assessable shares of common stock of SCP (as such stock exists on the date of issuance of the Debenture, or any shares of capital stock of SCP into which such stock is hereafter changed or reclassified as common stock) (the *"Common Stock"*) as per the following conversion formula: The number of shares issued through conversion is equal to the conversion amount of ONE HUNDRED TWENTY FIVE THOUSAND AND NO/100 DOLLARS ($125,000.00) divided by the conversion price on the Effective Date hereof. As of the Effective Date of this Agreement and for the remaining period during which the conversion right exists, SCP shall reserve from its authorized and unissued Common Stock a sufficient number of shares to provide for the issuance of Common Stock upon the full conversion of the Debenture. SCP represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. SCP agrees that the Debenture will, at issuance, constitute full authority of its officers, agents and transfer agents who are charged with the duty of executing and issuing stock certificates to execute and issue the necessary certificates for shares of Common Stock upon the conversion of the Debenture.

The Parties agree that upon Consultant filing an application with USCIS seeking such agency's approval of the Regional Center the Cash Portion of the Compensation shall be deemed to have been fully earned by ACG under any circumstance and not be contingent upon whether (i) ACG files an application for approval of the Regional Center with the USCIS; or (ii) USCIS approves an application as a designated Regional Center, if any such application is filed with the USCIS; or (iii) the success of any capital raise pursued under the EB-5 Program to provide funding of any kind or nature for the Proposed Project.

If for any reason, or no reason, SCP or Client fails (i) to pay to Consultant the Cash Portion of the Consideration when due as aforesaid, or (ii) to execute and deliver the Debenture to Consultant, then SCP shall immediately assign, convey and set over unto Consultant all its ownership interest in the SPE referenced in Section 2.1.1 hereof.

4.2 Equity Portion of the Consideration. Upon the successful completion of any raise, or a combination of raises, of capital made through the Regional Center for funding of the Proposed Projects in the following amounts (i) WiseBuys $5,000,000; (ii) Harbor Brewing $5,000,000; (iii) eight (8) Brew Pubs at $1,000,000 each or a total of $8,000,000; (iv) Alteri Bakery, Inc. $2,000,000; (v) five (5) Alteri Baker retail concept stores at $1,000,000 each or a total of $5,000,000; (vi) Hackett's $4,000,000; and (vii) Pay at Scan $1,000,000, (a total of $30,000,000) (the *"Raised Funds"*) Client shall assign, set over and convey to Consultant or cause the appropriate entity to assign, set over and convey to Consultant the following ownership interest in the equity of each of the of the following Proposed Projects (the *"Consultant's Equity Interest"*): (i) WiseBuys a 50% equity interest; (ii) Harbor Brewing a 15% equity interest; (iii) Brew Pubs a 50% equity interest in each of the first eight (8) pubs opened and thereafter a 20% equity interest; (iv) Alteri bakery a 15% equity interest; (v) Alteri retail concept a 50% interest; (vi) Hackett's a 40% equity interest; and (vii) Pay at Scan a 50% equity interest.

In the event the Raised Funds for any Proposed Projects are obtained by Client in tranches, then upon the time of the successful completion of any such tranche, Consultant shall be entitled to receive an ownership interest in the equity of that Proposed Projects in the same proportion (ratio) as the amount of the tranche is to the Raised Funds for that particular Proposed Project (the *"Consultant's Pro Rata Equity"*).

Upon the successful completion of any raise of capital through the Regional Center, Client shall assign, set over, and convey to Consultant or its assignee(s), the Consultant's Equity Interest if the entire amount of the Raised Funds are obtained by Client for that specific Proposed Project and if Client obtains any portion of the Raised Funds for a specific Proposed Projects in tranches, then Client shall assign, set over, and convey to Consultant or its assignee(s) Consultant's Pro Rata Equity in that specific Proposed Project.

The mathematical computation of the Consultant's Pro Rata Equity to be assigned, set over, and conveyed to Consultant upon the successful completion of any raise of EB-5 funds shall be calculated by multiplying the amount of the Consultant's Equity Interest in that Proposed Project by a fraction, the numerator of which shall be the dollar amount of the raise and the denominator of which is the *pro rata* amount of the Raised Funds for that specific Proposed Project. For example, if the total amount that is to be raised for a particular project is $5,000,000 and the total raised is offered in two separate raises of $2,500,000 each and Client is successful in raising the first $2,500,000; and if the Consultant Equity Interest is 50% in that particular Proposed Projects, then Consultant would be entitled to a 25% interest in that particular Proposed Project as Consultant's Pro Rata Equity for that specific Proposed Project.

The Parties hereby acknowledge and agree that upon the assignment of Consultant's Equity Interest or Consultant's Pro Rata Equity that Consultant shall be entitled to receive a percentage of all *Net Income* derived from the Proposed Projects in the same proportional amounts as its then existing ownership in the equity of the Proposed Projects. Further, Consultant will be responsible for a like proportion of all losses of the Proposed Projects; *provided however,* that under no circumstance will any member, manager, partner, or investor of, or in, Consultant be required to personally guarantee the payment of any debt of any of the Proposed Projects.

4.3 Compensation the Result of Negotiations. The Parties expressly acknowledge and agree that the amounts and percentages of the Cash Portion of the Consideration, Consultant's Equity Interest, and Consultant's Pro-Rata Equity are the results of vigorous negotiations between the Parties and (i) are strictly based upon the quality and extent of the consulting services provided by Consultant to Client, and (ii) a reasonable and an acceptable method of estimating the value of Consultant's services to be provided under the this Agreement.

5. **Representations and Warranties of Client.** Client hereby represents and warrants that any information supplied, or to be supplied from time to time, to Consultant pursuant to this Agreement in connection with any services to be performed hereunder by Consultant in behalf of Client shall be true, complete and correct as of the date of such dissemination and shall not fail to state a material fact which will result in such information being misleading. Client represents and warrants that it shall constantly update all information provided to Consultant to ensure that all information possessed by Consultant is true, correct, and current. Client represents and warrants that that it fully understands that in order to be able to count the indirect and induced jobs that are created by the investment of the foreign investors into the Proposed Projects that the geographical location of the Proposed Projects is required to be located within a *Targeted Employment Area* and more specifically defined under the EB-5 Program, and that if the exact geographical location of the Proposed Projects is determined not to be located within a Targeted Employment Area that Client and Consultant shall use commercially reasonable efforts to cause the geographical location of the Proposed Projects to be included within a Targeted Employment Area through the process of adjusting the geographical location of the Proposed Projects to include other contiguous census tracts within the Regional Center such that when such adjusted geographical area is considered as a whole, the adjusted geographical area will cause the Proposed Projects to be located within a Targeted Employment Area. Client hereby acknowledges that the Proposed Projects shall create at least ten (10) direct, indirect, and/or induced jobs for each FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000) invested in the Proposed Projects by each foreign investor as contemplated by the EB-5 Program. Client hereby acknowledges that the ability of Consultant to adequately provide the Consulting Services and effectuate introductions of foreign immigration brokers, finders, and legal professionals with respect to potential investments in the Proposed Projects is dependent upon the prompt dissemination of accurate, correct, and complete information to Consultant. Client further represents and warrants that this Agreement and the transactions contemplated hereby have been duly and validly authorized by all requisite corporate action; that Client has the full right, power and capacity to execute and deliver this Agreement and perform its obligations hereunder; that the execution and delivery of this Agreement and the performance by Client of its obligations pursuant to this Agreement do not constitute a breach of, or a default under, any agreement or instrument to which Client is a party or by which it or any of its assets are bound; and that this Agreement, upon execution and delivery of the same by the Parties that this Agreement constitutes a legally valid and binding obligation of the Parties enforceable in accordance with its terms. CLIENT FURTHER REPRESENTS AND WARRANTS THAT CLIENT FULLY UNDERSTANDS THAT CONSULTANT (I) IS NOT A BROKER/DEALER, (II) DOES NOT RAISE CAPITAL, AND (III) DOES NOT PROVIDE LEGAL SERVICES OR LEGAL ADVICE TO ITS CLIENTS.

The representations and warranties set forth herein shall survive any termination of this Agreement.

6. **Indemnification** Client hereby agrees to indemnify, defend and hold harmless Consultant, its directors, officers, principals, employees, agents, affiliates, shareholders, members, managers, representatives, consultants, successors and assigns from and against any and all claims, damages, losses, liability, deficiencies, actions, causes of action, suits, proceedings, costs, expenses or legal expenses (collectively the "*Losses*") arising out of or resulting from: (i) any breach of a representation, warranty or covenant contained in this Agreement by Client; (ii) any activities or services performed hereunder by Consultant, unless such Losses were the result of the intentional misconduct or gross negligence of Consultant; and/or (iii) any and all costs and expenses (including reasonable attorneys' and paralegals' fees) related to the foregoing.

Consultant shall promptly notify Client in writing of any fact or circumstance which may give rise to liability under this Section 6 after such fact or circumstance comes to the attention of Consultant. Client and its legal representatives shall compromise or defend any such matter involving asserted liability through counsel of Client's own choosing, at Client's expense; *provided, however,* that in the event of litigation, Client shall take all

actions necessary in order to protect Consultant. In the event Client undertakes to compromise or defend any such liability, Client shall notify Consultant in writing promptly of such intention to do so, and Consultant shall cooperate with Client and its counsel in the compromising of, or the defending against, any such liabilities or claims. Consultant shall have the right to employ counsel at Consultant's own expense to monitor the defense in any such claim. Should Client fail or refuse to defend any such claim, Consultant shall have the right to compromise said liability, or shall defend same, in which event Client shall be liable for all sums expended by Consultant in compromising and/or defending any such liability. The indemnification provisions hereunder shall survive any termination of this Agreement.

**7. EB-5 Investor Return and Security Interest.**

**7.1** The Parties understand and acknowledge that until such time as the entire amount of the loaned funds provided by the EB-5 Lender Entity to the various Owner Entities has been repaid to the EB-5 Lender Entity, that the EB-5 Lender Entity may require, depending on the terms and conditions of the loan documents to be executed at the closing of the loan, that the Owner Entity pay a preferred return of up to six percent (6%) per annum on the unpaid portion of such loaned funds; and

**7.2** The Parties understand and acknowledge that in order to secure the timely return of all EB-5 Financing loaned by the EB-5 Lender Entity to the Owner Entity that the EB-5 Lender may require the Owner Entity to grant to the EB-5 Lender Entity a security interest in and to, and may be required to pledge, assign and grant to the EB-5 Lender Entity, subject only to any secured senior debt financing, its then owned and thereafter acquired, right, title, interest, and share in the land, plant, and equipment of the Proposed Project (the *"Assets"*) as a security title to, and a continuing security interest in, the Assets. In such an eventuality the security interest may be granted to the EB-5 Lender Entity by appropriate recorded security instruments evidencing such lien hold security interest in the Assets, which may not be released or be deemed satisfied until the entire amount of the EB-5 Financing has been returned to the EB-5 investors.

**8. Distribution of Net Income.** In order to repay and fully satisfy the EB-5 Financing debt the Owner Entity shall cause the *Net Income* of each the Proposed Projects to be distributed as follows:

First, until the first $15,000,000.00 of the EB-5 Financing has been repaid to the EB-5 investors, 80% of the cash will be returned to the EB-5 investors and 20% to owners of the various Owner Entities.

Second, after the first $15,000,000.00 of the EB-5 Financing is returned to the EB-5 investors and until the entire EB-5 Financing has been repaid to the EB-5 investors, 60% of the cash will be returned to the EB-5 investors and 40% to owners of the various Owner Entities.

Third, after the entire EB-5 Financing has been repaid to the EB-5 investors 100% of the cash will distributed to the owners of the various Owner Entities.

**9. Owner Entity and Governance.** The Parties agree to jointly organize a separate appropriate special purpose entity that will own and operate each of the businesses of the Proposed Projects (each an *"Owner Entity"* and collectively the *"Owner Entities"*). Client will contribute as its initial capital contribution to the Owner Entity for any given Proposed Project the assets of that particular Proposed Project and Consultant will contribute the Consulting Services to such Owner Entity as its initial capital contribution. The initial ownership/membership interest in each of the Owner Entities will be held ninety-five percent (95%) by Client and five percent (5%) by Consultant. Client will assign, set over, and convey additional ownership/membership interest in each of the Owner Entities to Consultant in accordance with Section 4 of this Agreement. The organizational documents of each of the Owner Entities shall provide that governance of the Owner Entities shall be through a board of directors or like body (the *"Governing Body"*). The appointment of the members of each Governing Body shall be allocated between Client and Consultant on a Pro Rata basis of their ownership/membership interest in that particular Owner Entity, *provided however*, that from the date on which each Owner Entity is organized and at all times subsequent thereto, at least one (1) member of the Governing Body shall be appointed by Consultant. The