UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In Re:

PATRICK HACKETT HARDWARE COMPANY,                    Chapter 11
                                                     Case No. 09-63135

                                *Debtor.*
_____

# SECOND DISCLOSURE STATEMENT

NOTICE:  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION
OF THE PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL
A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY
COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL
BUT HAS NOT BEEN APPROVED BY THE COURT.

**Antonucci Law Firm, LLP**
David P. Antonucci, of counsel
Attorneys for Debtor
Bar Roll No.: 101041
12 Public Square
Watertown, New York 13601
(315) 788-7300

## INTRODUCTION

On November 11, 2009 (the "Petition Date"), Patrick Hackett Hardware Company ("Hacketts") filed a petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code (hereinafter the "Code") with the United States Bankruptcy Court for the Northern District of New York, Utica Division (hereinafter the "Court"). Pursuant to §§1107 and 1108 of the Code, Hacketts has and continues to operate its business and manage its property as a Debtor-in-Possession. Hacketts has filed a Second Plan of Reorganization (the "Plan"). As it relates to the Plan, Hacketts has prepared this Disclosure Statement pursuant to Bankruptcy Rules 3016 and 3018, and in compliance with §1125(b) of the Code, for the purposes of soliciting acceptances to the Plan.

The purpose of this Disclosure Statement is to give creditors and other holders of claims sufficient information to allow them to make informed votes to accept or reject the Plan. The opinion of Hacketts is that the acceptance of the Plan is in the best interest of each class of creditors and claimants, and Hacketts recommends that each creditor and claimant vote to accept the Plan.

The Court has set a date of _____ and fixed a time of __ a.m. in the United States Bankruptcy Court, 10 Broad Street, Utica, New York as the date for the hearing on approval of this Disclosure Statement. Any objections to the approval of the Disclosure Statement must be filed with the Bankruptcy Court and a copy served upon Hacketts' counsel at least five (5) business days before the hearing date. Hacketts' counsel is the Antonucci Law Firm LLP, 12 Public Square, Watertown, New York 13601. If the Disclosure Statement is approved, the Court shall schedule a time by which creditor may vote to accept or reject the Plan.

The vote of each creditor is meaningful. The Plan will be accepted if it is approved by

each class of these voting creditors. For a class to approve the Plan those members who hold claims of at least 2/3 in dollar amount of the class and comprise 1/2 in number of the voting claims of the class must approve the Plan. Those creditors who are entitled to vote on the Plan may do so by submitting the enclosed ballot for accepting or rejecting the Plan (the "Ballot") to counsel for Hacketts at the address set forth below, no later than the deadline set by the Court as contained in the attached Order.

> Hacketts Counsel: Antonucci Law Firm LLP
> 12 Public Square
> Watertown, New York 13601

To be counted, your ballot indicating acceptance or rejection of the plan must be received no later than 4:00 P.M. EST on _____, 2011.

## DISCLAIMER

COPIES OF THE PLAN WILL BE SENT WITH, AND ARE ATTACHED TO, THIS DISCLOSURE STATEMENT AS WELL AS TO EACH CREDITOR OR CLAIMANT IS ALLOWED TO VOTE ON THE PLAN. THE DEFINITIONS CONTAINED IN THE PLAN APPLY TO THIS DISCLOSURE STATEMENT AND EACH RECIPIENT OF THIS DISCLOSURE STATEMENT IS URGED TO REVIEW THE PLAN CAREFULLY. NO REPRESENTATIONS CONCERNING HACKETTS' FINANCIAL CONDITION, THE PLAN, OR THE VALUE OF HACKETTS' ASSETS ARE AUTHORIZED OR SET FORTH BY HACKETTS OTHER THAN AS SET FORTH HEREIN ANY REPRESENTATIONS OR PROMISES MADE TO INDUCE BALLOTS IN FAVOR OF THE PLAN, OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY ANY CLAIMANT OR CREDITOR IN REACHING A DECISION REGARDING THIS PLAN. ANY SUCH ADDITIONAL REPRESENTATIONS, PROMISES,

INDUCEMENTS SHOULD BE IMMEDIATELY REPORTED, PREFERABLY IN WRITING, TO COUNSEL FOR HACKETTS WHO SHALL DISCLOSE SUCH INFORMATION TO THE COURT WHICH SHALL ACT UPON SUCH INFORMATION IN THAT MANNER WHICH IT DEEMS APPROPRIATE. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT OR TO ANY OTHER ACCOUNTING REVIEW EXCEPT AS NOTED HEREIN. DUE TO THE ACCOUNTING COMPLEXITIES INHERENT IN ANY CHAPTER 11 CASE, THE COMPLEXITY OF HACKETTS' FINANCIAL MATTERS, AND THE STATE OF HACKETTS' FINANCIAL, LEGAL AND ACCOUNTING RECORDS, HACKETTS IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE. PROJECTIONS HAVE BEEN MADE SOLELY UPON THE EXPECTATIONS AND RECORDS OF HACKETTS WITH RESPECT TO FUTURE REVENUES AND OPERATING EXPENSES, AS WELL AS THE ALLOWANCE OF VARIOUS CLAIMS. CREDITORS ARE URGED TO READ THROUGH ALL OF THE DISCLOSURE STATEMENT, PLAN AND OTHER DOCUMENTS ENCLOSED HEREIN, AND THEN TO CONSULT WITH THEIR ATTORNEYS, PROFESSIONAL ADVISERS OR OTHERS WHOM THEY MAY DEEM HELPFUL OR RELY UPON IN REACHING THEIR DECISIONS ABOUT THE PLAN. APPROVAL BY THE COURT OF THIS DISCLOSURE STATEMENT IS NOT A RECOMMENDATION CONCERNING THE MERITS OR ACCEPTABILITY OF THE PLAN.

# PATRICK HACKETT HARDWARE COMPANY ("HACKETTS")

Hacketts is a New York State domestic corporation that was officially incorporated in 1901, although its actual business operations date back to the mid-1800s. The current President and sole officer of Hacketts is Herbert Becker. The sole shareholder of Hacketts is Wisebuys, Inc. ("Wisebuys"), and the control shareholder of Wisebuys, Inc. is Seaway Valley Capital Corporation ("SVCC"). The sole officer and director of both Wisebuys and SVCC is Thomas Scozzafava. Mr. Scozzafava is also the Chairman and sole director of Hacketts.

Hacketts is a department store retailer that sells a wide variety of merchandise including apparel, footwear, gifts, specialty foods and select hardware. Hacketts also operates a restaurant contained within its Ogdensburg location. At this time Hacketts operates one location in Ogdensburg, New York in St. Lawrence County. Hacketts possesses all necessary licenses and permits to serve/sell food and generally operate. Hacketts actively operates year round, but traditionally Hacketts' revenues and income fluctuate seasonally with the holiday/Christmas, spring and back-to-school seasons being peak periods, and with winter, summer and fall being the slower periods. The holiday/Christmas season is the most important period for Hacketts.

Besides management, Hacketts employs between eight and ten other employees, none of whom are related to officers or directors of the company. The President operates the premises daily and remains in control of all purchasing, financial records and day-to-day decisions. Upon confirmation no material changes in management are contemplated during the duration of the Plan.

Hacketts' equipment is adequate for its needs - especially as the scope of its operations has become narrower. Hacketts does not envision any need to upgrade or repair its equipment or fixtures beyond normal wear and tear. It has recently updated and modified its point of sale

system to reduce costs and better track inventory.

Hacketts owns multiple real properties including the one at which its remaining store is located. More specifically, Hacketts owns three properties: (i) the 5,500 square foot Miner Street location in Canton, NY (the "Miner Street" location); (ii) the 22,300 square foot State Street location in Ogdensburg, NY (the "State Street" location); and (iii) the 53,800 square foot Pickering Street location also in Ogdensburg, NY (the "Pickering Street" location.) Currently the Miner Street and State Street locations are not being utilized by Hacketts or leased by Hacketts to third parties. Today, 100% of Hacketts operations are maintained at the Pickering Street location, but management has determined that the 53,800 square foot space is beyond the current needs of Hacketts' current and future business operations.

## HISTORICAL INFORMATION AND EVENTS LEADING TO FILING



Hackett's Corporate Timeline

Throughout the vast majority of Hacketts' history, the company was exclusively a full service hardware store and operated only one location. Hacketts' original location was on Water Street in Ogdensburg, NY. Over the years the company gradually expanded its product offerings to also include select and limited clothing and footwear. These facets of the business differentiated Hacketts from hardware-only competitors, and then-management decided to continue to emphasize these "soft" merchandise product lines. Eventually and as a result of this

strategy, the company moved to its current larger location on Pickering Street. At the Pickering Street location, Hacketts continued to offer full service hardware through its affiliation with True Value Company, and even in the face of increased national chain competition the hardware business remained profitable based on significant "Hacketts" brand equity and customer loyalty in the community of Ogdensburg. The expanded lines of clothing, footwear and gift merchandise also proved successful. Additionally, the seasonal highs and lows of the hardware business offset the seasonal highs and lows of the softer lines. The combination of full service hardware and soft lines (the "hybrid" model) was, indeed, a profitable business model for Hacketts for many years in Ogdensburg, NY. Throughout its history Hacketts had always been run by a Hackett family member.

For the first time in its history, the Hackett family elected to hire a non-family member to run its operations. Then led by President and CEO, Norman Garrelts, Hacketts elected to aggressively expand beyond Ogdensburg, and in 1999 and 2002 opened stores in Canton, NY and Massena, NY, respectively. These two new locations, however, only included clothing, footwear and select gift items. The two new locations proved modestly successful and complemented Hacketts' flagship "hybrid" store in Ogdensburg. Management elected to replicate the Ogdensburg hybrid model, and in 2003 and 2006 management opened two new stores in Potsdam, NY and Watertown, NY, respectively. Each of these stores was a large format store (each at 50,000-plus square feet) with both full service hardware (also True Value) and soft lines.

In 2006, Mr. Garrelts approached the management of regional retail rival, WiseBuys Stores, Inc. ("WSI"), to discuss the possibility of Hacketts acquiring WSI. WSI, whose management included Mr. Scozzafava, operated five retail locations that were also located in central and northern New York. Mr. Garrelts' intent was to convert the five WSI stores to Hacketts stores, each of which would replicate the Ogdensburg hybrid model of both full service

hardware and softline goods. Hacketts and WSI executed a letter of intent and eventually a purchase contract contingent upon financing. After approximately 6-9 months, Hacketts failed to arrange the necessary financing to close the transaction. However, in an effort to save the business combination, WSI management offered to acquire Hacketts. This offer was accepted by the shareholders and management of Hacketts. WSI subsequently arranged said acquisition financing, and in November 2007, WSI acquired Hacketts.

Despite WSI being the acquirer of Hacketts, it was decided that the "Hacketts" brand and operating model would remain the surviving brand and operating model. Additionally, Hacketts' legacy management, which included Mr. Garrelts, Patrick Hackett, Jr., and Julie Hackett Cliff, remained the senior management of the combined and expanded company with titles of CEO, Sr. Vice President and Sr. Vice President, respectively. Mr. Scozzafava, a founder and the Chief Financial Officer of WSI, did not take a management position at Hacketts but did serve as Chairman of the board of directors of Hacketts.

In the first quarter of 2008, management began the process of converting the former WSI stores to "Hacketts" brand stores. It was during this time that the company sought financing for its existing operations and for the five WSI store conversions. To this end, Hacketts successfully closed two significant financing transactions totaling $7.2 million. Specifically, in April 2008, Hacketts closed both a $5 million senior loan agreement with Wells Fargo and a $2.2 million investment by YA Global Investments. The YA Global investment consisted of the purchase from Community Bank, NA of its senior secured loans and security interest of Hacketts. YA Global then subordinated its senior secured interest to Wells Fargo and accepted an agreement by Seaway Valley Capital Corporation to replace Hacketts as the obligor on the indebtedness now held by YA Global. The result of that investment was the elimination of $2.2 million of debts on the books and records of Hacketts. YA Global retained, however, its security interest in certain assets of

Hacketts.

By the early fall of 2008, three of the five WSI stores had been converted to "Hacketts" stores, and work continued to convert the two remaining stores. However, about that same time the financial markets and consumer spending began to deteriorate rapidly. The primary driver of this negative financial and operating environment was a deteriorating residential housing market that had the effect of negatively impacting the balance sheets of banks and consumers. By the forth calendar quarter of 2008, Wells Fargo demanded and imposed a condition that Hacketts immediately raise a minimum of an additional $2 million of junior financing. At the height of the panic on Wall Street and with consumer spending at record lows, raising this financing for this relatively small retailer was virtually impossible. Hacketts did manage to raise approximately $400,000 in additional junior capital but could not meet the entire $2 million milestone that Wells Fargo had imposed upon the company. Consequently, despite never having missed a single loan repayment and less than twelve months after receiving the Wells Fargo loan, in January 2009, Wells Fargo demanded the complete repayment of $5 million line of credit.

Wells Fargo had a perfected first lien upon essentially all assets of Hacketts except its real property. Wells Fargo compelled Hacketts to engage in a massive "sell down" or liquidation of its inventory and the closing of most of its stores. This process proved devastating to the company. Over the course of 8-9 months most of Hacketts' bills remained unpaid and virtually no new inventory could be acquired because Wells Fargo had the company's cash receipts in a "lock box" arrangement. That is, Walls Fargo was in de facto control of cash receipts and cash expenditures, and Wells Fargo limited the use of the company's cash to: (i) payroll, (ii) utilities and (iii) Wells Fargo debt reduction and Wells Fargo-imposed fees, which totaled about $500,000 beyond the $5 million line of credit. During this period Wisebuys elected to replace Hacketts' senior management, and Herbert Becker was brought in to run the company as

- 9 -

President and CEO. Mr. Becker navigated the process of repaying Wells Fargo until the entire $5 million line of credit (plus the approximate $500,000 in fees) was completely repaid in July/August 2009.

Just prior to the complete repayment of the Wells Fargo loan, however, various unsecured creditors filed an involuntary petition for relief under Chapter 7 of the Code. That matter was ultimately dismissed shortly thereafter through a negotiation with counsel for the petitioners.

Ultimately, however, as a result of Hacketts' inability to pay, in particular, two past-due bills of vendors not represented by the counsel of aforementioned unsecured creditor group, Hacketts' bank accounts became restrained and inaccessible to the company in November 2009. As a result, in November 2009, Hacketts was forced to seek voluntary protection by filing under Chapter 11 of the Code.

## CHAPTER 11 FILING AND SUBSEQUENT PROCEEDINGS

As described above, Hacketts filed its voluntary petition for relief under Chapter 11 of the Code in November 2009. Since the Filing Date, the Hacketts has been represented by Antonucci Law Firm LL.P ("Counsel"). Hacketts has not sought the appointment of an accountant. An official Committee of Unsecured Creditors pursuant to §1102 of the Code has been formed, and that Committee has retained Cooley, Godward LLP as its counsel.

Key Bank, NA and two partial assignees hold a perfected first mortgage upon the Pickering Street real property. YA Global Investments holds perfected first mortgages on both the Miner Street and State Street real properties. YA Global Investments and True Value each have perfected liens upon the company's personal property. In addition, Wells Fargo sought a determination that it held a perfected first lien on the personal property of Hacketts. The court subsequently denied that application.

On or about January 15, 2010, True Value commenced an adversary proceeding under Adv. Proc. No. 10-80004-6 to determine that its lien be considered superior to those of YA Global Investments, Wells Fargo and others. That action has been voluntarily discontinued by True Value without prejudice, but the issue has not been resolved. No preference or related actions have been commenced by Hacketts. Hacketts is preparing such actions with respect to certain judgment lien creditors.

Certain post-petition real property tax obligations also exist that, although unpaid, Hacketts can satisfy upon confirmation. Other, minor purchase money secured interests have been paid in accordance with their contract terms. No creditors other than YA Global and True Value have sought adequate protection or relief pursuant to II USC §362.

Hacketts has paid its ordinary course of business expenses and for maintenance of personal property without exception save those mentioned above and other minor obligations that will be paid upon the effective date or upon such other terms and the parties may agree.

## PROCEDURES IMPLEMENTED TO RESOLVE FINANCIAL PROBLEMS

The impetus and primary driver of Hacketts' financial destabilization and need to file its Chapter 11 petition was the immediate and rapid deterioration of the residential housing market that, in turn, weakened both consumers and banks. To a large degree, Hacketts was the victim of the confluence of a massive drop in consumer spending coupled with a severely retracting credit market. Wells Fargo, which in 2008 received a $25 billion capital infusion by the federal government, demanded that Hacketts also obtain a capital infusion. Unfortunately, at that time the capital markets were not as accessible to Hacketts as government funds were to Wells Fargo. These conditions prevented the completion of the merger of WSI and Hacketts and the complete implementation of the company's business plan. Consequently, the pre-bankruptcy financial performance of the merged entity is not particularly helpful in evaluating the future

profitability of the reorganized entity.

Current Hacketts management has done a remarkable job over the past 12 months of reshaping what was left of Hacketts into a viable and sustainable company. Specifically, management has implemented the following operational changes:

- **Closed Marginal and Unprofitable Locations**: Management has closed nine out of its ten locations, has rejected all real property leases, and has focused its managerial and capital resources towards rebuilding its original, historically profitable location in Ogdensburg, NY. As a result of these store closings Hacketts has eliminated $12 million in annual expenses and millions in store losses.

- **Eliminated Marginal and Unprofitable Business Lines**: Hacketts has exited lines of businesses that it does not consider core such as: (i) all terrain vehicle ("ATV") sales, (ii) motorcycle sales and repairs, and (iii) small engine repairs.

- **Eliminated Business Lines that Require Significant Capital Investment**: Hacketts has exited lines of businesses that require significant working capital and payroll investment such as: (i) all terrain vehicle sales, (ii) motorcycle sales and repairs, and (iii) full service hardware.

- **Significantly Reduced Payroll at Ogdensburg Location**: On an annual basis payroll at the Ogdensburg location has been reduced by $1,415,521. Once the Pickering Street building is sold Hacketts will eliminate another $150,000 in annual overhead and payroll.

- **Repositioned in Marketplace to Increase Breadth of Customers**: Hacketts has traditionally been known in the marketplace as a higher-end retailer, which significantly limited the number of customers that could affordably shop there. Over the years the economic environment in the "north country" in New York has continued to deteriorate. Mr. Becker has been changing the product mix to include a larger percentage of quality

goods at affordable prices. This strategy has resulted in dramatically increasing the reach and appeal of the company's merchandise.

- **Replacing Low Value Legacy Inventory with Higher Margin and Seasonally Relevant**

    **Merchandise**: After the Wells Fargo-imposed inventory sell down (that included sale event after sale event), the company's remaining inventory included mostly seasonally irrelevant, obsolete, and "odds and ends" merchandise. What remaining inventory that was left at Hacketts certainly did not represent a coherent merchandise or selling strategy. Additionally, the carried book value of this inventory remained constant despite its irrelevance or obsolescence. Said another way: the remaining inventory value was overstated on the Company's books and records because it remained recorded at "cost" – not the inventory's true and diminishing sale value.

    By way of example: assume that in the spring Hacketts acquired a plastic Adirondack lawn chair as part of a number of four-piece plastic Adirondack chair sets, and each chair was acquired for $24. Later in the fall, all but one of chairs have been sold. It is unlikely that in the fall, and with no matching chairs, the one remaining Adirondack chair will sell for a profit (i.e., above $24). Therefore, it makes sense for that retailer to sell that one remaining plastic Adirondack chair for highest price it can realistically generate. It is likely that this sale price will not result in a "GAAP" profit based on the chair's original purchase price. Unfortunately, because that chair was acquired for $24 if it is sold for anything less than $24 it will be recorded as a sale with negative gross margin and produce a loss.

    The condition of the company 12 months ago was essentially a larger version of that example. So because most of Hacketts' entire merchandise was similar to the above example, the fact that the company was selling inventory below its historic cost **is not an**

**indication of Hacketts' inability to become profitable once again**.  To turn the company around, new management has systematically and continuously replaced obsolete and irrelevant merchandise inventory with fresh and relevant inventory.  This has resulted in continuously higher monthly gross margins as the newer inventory becomes a larger percentage of sales.

- **More Aggressive Promotional Advertising Campaigns**:  Hacketts is currently advertising more aggressively than it had under prior management.  Hacketts is running advertisements on radio and multiple times per month in local and regional newspapers.  Hacketts also recently installed a lighted road sign with changeable letters where messages and specials can rotate daily.  Hacketts has also developed a brochure that is placed at the Canadian and American side of the border crossings.  Street signs, similar to political campaign signs are being effectively used along highway 37 all the way from the International Bridge to the various exits to the Ogdensburg store.  Finally, Hacketts more aggressively promotes within the store with audio messages on the public address system as well as a "chalk board" at the front door promoting specials.  This more aggressive or "gorilla" marketing has led to noticeable increase in first-time shoppers.

- **Proposed Asset Sales to Reduce Debt and Overhead Expenses**:  In an effort to significantly reduce the company's indebtedness and recurring overhead expenses, management proposes the following assets sales based on management's opinion of the value of these assets:

## Patrick Hackett Hardware Company
### Anticipated Asset Sales

| Asset | Value Range | | Comments |
| --- | --- | --- | --- |
| | Low | High | |
| State Street | $350,000 | $450,000 | signed $400k purchase contract |
| Miner Street | $100,000 | $125,000 | buyer interested |
| Pickering Street | $850,000 | $1,100,000 | 12-16 month estimated sale |
| | $1,300,000 | $1,675,000 | |

Neither the Miner Street nor the State Street locations are currently used by Hacketts or leased to third parties. Therefore, management has decided that in an effort to reduce overhead and repay indebtedness it is in the best interest of the company to sell each of the properties. As previously disclosed, management has received and executed a conditional offer to sell its State Street location. The sale price is roughly equivalent to the mortgage that secures the property, and management is proposing that the proceeds be used for mortgage debt repayment. The result would reduce $400,000 of indebtedness of the senior secured lender and mortgage holder, YA Global Investments. Additionally, Hacketts will reduce annual interest expense of approximately $48,000 per year through the reduction of said debt as well as another estimated $50,000 in reduced property taxes, utilities, maintenance and repairs.

The company has also been approached regarding the sale of its Miner Street location. The potential buyer currently owns the real property adjacent to the Hackett store and represents what management considers a serious buyer. As with the State Street property, management proposes allocating the sales proceeds to reduce the secured mortgage debt held by YA Global Investment Partners of approximately $100,000. Hacketts will reduce annual interest expense of approximately $12,000 per year through the reduction of said debt as well as another estimated $20,000 in reduced property taxes, utilities, maintenance and repairs.

Finally, based on Hacketts new product mix, which does not include full service hardware, ATV sales, lawn equipment, or small engine repair, management has concluded that it can operate more profitably in a smaller retail space and in a more strategic location closer to other retailers. Management has concluded that the 53,800 square foot Pickering Street building when sold should generate sales proceeds of between $750,000 and $1.1 million, which shall be used in following order: first, the repayment of the mortgages held by Key Bank, NA and its assignees (mortgage balance is approximately $625,000.00); second, to pay any unpaid administrative expenses; third, to fund the costs of moving Hacketts operations to a leased facility (not to exceed $15,000); forth, to create a capital reserve to fund any payments due to the unsecured creditors as provided in the Plan; and fifth, the balance, if any, to be provided to Hacketts for working capital needs. By selling the Pickering Street location Hacketts will reduce annual interest expense of approximately $40,000 per year through the reduction of said debt and save another estimated $70,000 in reduced property taxes, utilities, maintenance and repairs.

By selling all three real properties management expects to reduce debt by $1.3 million to $1.675 million and reduce annual recurring operating expenses by almost $250,000 per year.

Upon sale of the Pickering Street location, management would transfer its operations to a smaller, leased property in Ogdensburg. Management has targeted leasing a retail space in a range of 4,000 to 5,000 square feet, and estimates that Hacketts total occupancy expenses would be no more than $60,000 per year. Specifically, Mr. Becker has already opened discussions with the landlord of a more preferred retail space currently available in the more heavily retailed and trafficked area of Ogdensburg. Hacketts' financial projections anticipate moving to a smaller location, which is in a well-trafficked retail strip mall.

As of the Filing Date, Hacketts had contingent, non-contingent and disputed claims exceeding $10,000,000 and currently has assets with a fair market value, based on Hacketts' estimates, as set forth in the table below.

| Patrick Hackett Hardware Company Assets | | |
|---|---|---|
| | Value Range | |
| Assets | Low | High |
| State Street | $350,000 | $450,000 |
| Miner Street | $100,000 | $125,000 |
| Pickering Street | $850,000 | $1,100,000 |
| Inventory | $100,000 | $200,000 |
| Sundry Assets | $25,000 | $75,000 |
| | $1,425,000 | $1,950,000 |

Hacketts is indebted to its legal counsel, and counsel for Hacketts has agreed to accept those fees over a period of time if necessary. It is estimated that the total approximate amount due the professionals on the Effective Date of the plan will be $25,000. There is also an administrative debt to the various taxing entities in the approximate amount of $8,000. No other obligations or administrative debt has accrued except counsel fees to the Committee that continue to accrue and are estimated to ultimately result in a claim of approximately $40,000. Total administrative expenses are estimated to be between $75,000 and $100,000 in aggregate.

Since the Filing Date, Hacketts has prepared and filed Monthly Operating Reports as required by the United States Trustee. Additionally and attached hereto, Hacketts has included financial projections. Those projections reflect profitable operations of Hacketts upon reorganization. The profitable operations indicates a notable change from the prior four years of operations, which resulted from the rapid expansion and then merger with WSI, then ultimate

sell down. Management presents the following seven year projections:

| PATRICK HACKETT HARDWARE COMPANY | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Seven Year Projections | | | | | | | |
| | 2011 | | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 |
| Sales Square Footage | | 4,100 | | 4,100 | | 4,100 | | 4,100 | | 4,100 | | 4,100 | | 4,100 |
| Sales / Sq. Foot | $ | 350.00 | $ | 400.00 | $ | 414.00 | $ | 426.42 | $ | 439.21 | $ | 452.39 | $ | 465.96 |
| % Growth | | | | 14.3% | | 3.5% | | 3.0% | | 3.0% | | 3.0% | | 3.0% |
| **Sales** | | $ 1,435,000 | | $ 1,640,000 | | $ 1,697,400 | | $ 1,748,322 | | $ 1,800,772 | | $ 1,854,795 | | $ 1,910,439 |
| % Growth | | | | 14.3% | | 3.5% | | 3.0% | | 3.0% | | 3.0% | | 3.0% |
| Pmt to Unsecureds @ 1.5% | $ | 21,525 | $ | 24,600 | $ | 25,461 | $ | 26,225 | $ | 27,012 | $ | 27,822 | $ | 28,657 |
| Cost of Goods Sold | $ | 861,000 | $ | 984,000 | | $ 1,018,440 | | $ 1,048,993 | | $ 1,080,463 | | $ 1,112,877 | | $ 1,146,263 |
| % Sales | | 60.0% | | 60.0% | | 60.0% | | 60.0% | | 60.0% | | 60.0% | | 60.0% |
| **Gross Profit** | $ | 552,475 | $ | 631,400 | $ | 653,499 | $ | 673,104 | $ | 693,297 | $ | 714,096 | $ | 735,519 |
| % Margin | | 38.5% | | 38.5% | | 38.5% | | 38.5% | | 38.5% | | 38.5% | | 38.5% |
| **Total Op Expense** | $ | 485,507 | $ | 532,809 | $ | 533,670 | $ | 534,434 | $ | 535,221 | $ | 536,031 | $ | 536,866 |
| % Sales | | 33.8% | | 32.5% | | 31.4% | | 30.6% | | 29.7% | | 28.9% | | 28.1% |
| **EBIT** | $ | 66,968 | $ | 98,591 | $ | 119,829 | $ | 138,670 | $ | 158,077 | $ | 178,065 | $ | 198,653 |
| % Margin | | 4.7% | | 6.0% | | 7.1% | | 7.9% | | 8.8% | | 9.6% | | 10.4% |
| **Interest Expene** | | | | | | | | | | | | | |
| KeyBank | $ | 39,063 | $ | 19,531 | $ | - | $ | - | $ | - | $ | - | $ | - |
| YA Mortgages | $ | 3,250 | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| NYS | $ | 15,625 | $ | 14,844 | $ | 13,281 | $ | 10,938 | $ | 7,813 | $ | 4,688 | $ | 1,563 |
| Sr. Secured | $ | 9,375 | $ | 8,594 | $ | 7,031 | $ | 5,469 | $ | 3,906 | $ | 2,344 | $ | 781 |
| Total Int. Exp. | $ | 67,313 | $ | 42,969 | $ | 20,313 | $ | 16,406 | $ | 11,719 | $ | 7,031 | $ | 2,344 |
| **Income b/f Taxes** | $ | (345) | $ | 55,622 | $ | 99,517 | $ | 122,264 | $ | 146,358 | $ | 171,034 | $ | 196,310 |

The above projections assume the following:

- Hacketts operates one leased store of 4,100 square feet at $60,000 annual rent

- The Unsecured Creditors receive an annual payment of not less than 1.5% of sales per the terms of the Plan.

- The State Street property is sold immediately for $400,000 and mortgage repaid

- The Miner Street property is sold in mid-2011 for $100,000 and mortgage repaid

- The Pickering Street property is sold for $825,000, of which $625,000 is used to repay the mortgages held by Key Bank, NA and its assignees

- $250,000 of New York State back sales taxes are repaid plus 6.25% interest

- The Sr. Secured creditors are repaid $150,000 plus 6.25% interest

Other key metrics include the following:

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| **Balance Sheet Items** | | | | | | | |
| Key Bank/ Assignees Mortgage | $ 625,000 | $ - | $ - | $ - | $ - | $ - | $ - |
| YA Global Mortgages | $ 100,000 | $ - | $ - | $ - | $ - | $ - | $ - |
| NYS Tax Balance | $ 250,000 | $ 225,000 | $ 200,000 | $ 150,000 | $ 100,000 | $ 50,000 | $ - |
| Secured Creditors | $ 150,000 | $ 125,000 | $ 100,000 | $ 75,000 | $ 50,000 | $ 25,000 | $ - |
| Total Debt | $ 1,125,000 | $ 350,000 | $ 300,000 | $ 225,000 | $ 150,000 | $ 75,000 | $ - |

All debt is repaid plus 6.25% annual interest.

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| **Other** | | | | | | | |
| Cumulative Payments to Unsecureds: | | | | | | | |
| Operations | $ 21,525 | $ 46,125 | $ 71,586 | $ 97,811 | $ 124,822 | $ 152,644 | $ 181,301 |
| Real Estate Sales | $ - | $ - | $ - | $ - | $ - | $ - | $ 118,699 |
| Other Assets Sales | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total | $ 21,525 | $ 46,125 | $ 71,586 | $ 97,811 | $ 124,822 | $ 152,644 | $ 300,000 |
| | | | | | | | |
| Cumulative Payments to: | | | | | | | |
| YA Global Mortgages | $ 503,250 | $ 503,250 | $ 503,250 | $ 503,250 | $ 503,250 | $ 503,250 | $ 503,250 |
| YA Global Ops | $ 4,688 | $ 21,484 | $ 37,500 | $ 52,734 | $ 67,188 | $ 80,859 | $ 93,750 |
| True Value | $ 4,688 | $ 21,484 | $ 37,500 | $ 52,734 | $ 67,188 | $ 80,859 | $ 93,750 |

A detailed breakdown of Hacketts Total Operating Expenses line item from the above financial projections is as follows:

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| Advertising | $ 24,000 | $ 24,000 | $ 24,000 | $ 24,000 | $ 24,000 | $ 24,000 | $ 24,000 |
| Automobile Expense | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Bank Service Fees | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Cash over / short | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Check Processing Fees | 1,420 | 1,420 | 1,420 | 1,420 | 1,420 | 1,420 | 1,420 |
| Computer Expenses | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Credit Card Expenses | 21,525 | 24,600 | 25,461 | 26,225 | 27,012 | 27,822 | 28,657 |
| DBL Insurance Expense | 4,734 | 4,734 | 4,734 | 4,734 | 4,734 | 4,734 | 4,734 |
| Delivery Expense | 2,915 | 2,915 | 2,915 | 2,915 | 2,915 | 2,915 | 2,915 |
| Dues and Subscriptions | 4,075 | 4,075 | 4,075 | 4,075 | 4,075 | 4,075 | 4,075 |
| Freight and Shipping Costs | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Group Health insurance | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Utilities | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 |
| Insurance Expense | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Internet Expense | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 |
| Medical / Workers Comp | 142 | 142 | 142 | 142 | 142 | 142 | 142 |
| Miscellaneous Expense | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Office Supplies and Postage | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 |
| Payroll Expenses | 126 | 126 | 126 | 126 | 126 | 126 | 126 |
| Payroll Fees | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 |
| Payroll Taxes | 70,110 | 70,110 | 70,110 | 70,110 | 70,110 | 70,110 | 70,110 |
| Rent | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| Repairs | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Safe Harbor Match | 6,706 | 6,706 | 6,706 | 6,706 | 6,706 | 6,706 | 6,706 |
| Salaries-Asst Manager | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Salaries - Store Mgr | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Salaries - Supervisor | 78,820 | 78,820 | 78,820 | 78,820 | 78,820 | 78,820 | 78,820 |
| Salaries - Staff | 99,050 | 134,227 | 134,227 | 134,227 | 134,227 | 134,227 | 134,227 |
| Store & Shop Supplies | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 |
| Tax | 2,028 | 2,028 | 2,028 | 2,028 | 2,028 | 2,028 | 2,028 |
| Telephone | 5,413 | 5,413 | 5,413 | 5,413 | 5,413 | 5,413 | 5,413 |
| Travel Expense | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Uncategorized Expenses | 371 | 371 | 371 | 371 | 371 | 371 | 371 |
| Waste and Garbage Disposal | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Add Workers Comp | 320 | 320 | 320 | 320 | 320 | 320 | 320 |
| **Total Op Expense** | $ 485,507 | $ 532,809 | $ 533,670 | $ 534,434 | $ 535,221 | $ 536,031 | $ 536,866 |
| % Sales | 33.8% | 32.5% | 31.4% | 30.6% | 29.7% | 28.9% | 28.1% |

## LIQUIDATION ANALYSIS

All of Hacketts' assets, both real and personal, are encumbered by security interests granted to YA Global and True Value, with the exception of the Pickering Street real property. As indicated below, the high range of the value of all assets excepting out the Pickering Street real property, is $850,000. The total amount owing to YA Global and True Value exceeds $3.5 million in aggregate. Consequently, in the event of liquidation there is no possibility of any recovery for the Unsecured Creditors from these assets.

The Pickering Street location has a value at the high end of the range of $1.1 million. In the event of liquidation at this high end at the sale price of $1.1 million, the sales proceeds would have to be used as follows: first, customary real property sales expenses of up to 10% of the sales price; second, to pay the first and second mortgage debts of $625,000; next to pay any unpaid administrative expenses now estimated to $75,000; next to pay pre-petition priority New York State sales tax obligations of $250,000. Therefore, under the most favorable liquidation assumption the amount available for distribution to unsecured creditors would not exceed $50,000. Under the Plan, the distribution to unsecured creditors is to be 3% of allowed claims. As previously indicated, the total amount of claim filed is approximately $10 million. After subtracting secured claims and without making allowance for disputed claims, a 3% distribution is several multiples of the amount that could be distributed to the unsecured creditors in the event of liquidation.

## Patrick Hackett Hardware Company
### Liquidation Analysis

| Assets | Value Range | | Comments |
| --- | --- | --- | --- |
| | Low | High | |
| State Street | $350,000 | $450,000 | signed $400k purchase contract |
| Miner Street | $100,000 | $125,000 | buyer interested |
| Pickering Street | $850,000 | $1,100,000 | 12-16 month estimated sale |
| Inventory | $100,000 | $200,000 | value in "sell down" mode |
| Sundry Assets | $25,000 | $75,000 | excess furniture & fixtures |
| | $1,425,000 | $1,950,000 | |

Hacketts Plan of Reorganization combines the benefit to creditors of orderly asset sales and the continuance of the Hacketts operations, which should result in a "best of both worlds" scenario.

### SUMMARY DESCRIPTION OF THE PLAN

Although a complete copy of the Plan is being transmitted with this Disclosure Statement, a brief description of the Plan Classifications and treatment proposed to same follows:

### CLASSIFICATION

The Code permits classification of claims into groups of claims with similar legal rights. Those classes and proposed treatments, for the purposes of Hacketts' Plan of Reorganization, are as follows:

### CLASSIFICATION AND TREATMENT OF
### CLAIMS AND EQUITY INTERESTS.

The plan classifies and treats the creditors in the following manner

**Unclassified Claims:** This consists of allowed expenses of administration pursuant to §503(b) of the Code. Such allowed expenses will be paid in full within thirty (30) days of the

Effective Date of the Plan, or in accordance with such other terms as may be agreeable between Hacketts and the holder of said claim, subject to Court approval and, further except as set forth below. These claims specifically include fees to professionals which have accrued after the Petition date and shall be exclusive of interest or penalties. The estimated claims in this class total approximately $75,000. These claims shall also include the payment of the United States Trustee fees pursuant to 11 U.S.C. 1930 until the closure of the case. These claims are not entitled to vote.

**Class 1:** This Class consist of the claims of YA Global Investments. Hacketts' Plan entails the sale of two real properties that management estimates will generate approximately $500,000 of sales proceeds. There is an executed $400,000 purchase contract for the company's State Street property. The company estimates it can sell its Miner Street property for approximately $100,000. One hundred percent of those proceeds would be used to repay the secured mortgage holder of the two properties, YA Global Investments.

Upon the sale of the State Street property and the Miner Street property, YA Global shall have an additional allowed secured claim in the amount of $75,000. YA Global's claim shall be paid equal monthly installments over a term of seven years beginning on the Effective Date with interest at 6.25% *per annum*.

YA Global shall retain its respective liens on the real and personal property of Hacketts to the extent the same existed prior to the commencement of this case. YA Global shall terminate its real property security interests upon the sale of its real property collateral and shall terminate its personal property security interests upon the payment in full of its additional allowed secured claim as provided for herein. YA Global's unsecured claim shall receive no dividend under this plan. Class 1 is impaired and entitled to vote.

**Class 2:** This Class consist of the claims of True Value Company. True Value shall have

- 23 -

an allowed secured claim in the amount of $75,000. True Value's claim shall be paid in equal monthly installments over a term of seven years beginning on the Effective Date with interest at 6.25% *per annum*.

True Value shall retain its respective liens on the personal property of Hacketts to the extent the same existed prior to the commencement of this case. True Value shall terminate its personal property security interests upon the payment in full of its allowed secured claim as provided for herein. True Value's unsecured claim shall receive no dividend under this plan. Class 2 is impaired and entitled to vote.

**Class 3:** This Class consists of the allowed secured claims of Key Bank and it successors and assigns (Gaus and Goshen) as concerns the Pickering Street real property of Hacketts. The members of this class shall retain their respective liens until their collateral has been sold. Notwithstanding, the members of this class shall be paid upon the sale or surrender of this collateral, which sale or surrender shall take place no later than 18 months from the Effective Date. Pending the sale or surrender of their collateral, Hacketts shall make interest payments to the members of this class at the rate of 6.25% *per annum*, payable monthly. The members of this class shall receive no distribution on account of an unsecured claim. Class 3 is impaired and is entitled to vote.

**Class 4:** This Class consists of the claims of St. Lawrence University and the Industrial Development Agencies of St. Lawrence County, Oswego County and Franklin County (collectively, the "Public Entities'). These claims will be treated in the same matter as unsecured creditors in Class 6 below. Class 4 is impaired and is entitled to vote.

**Class 5:** This Class consists of all lease holders and parties to executory contracts - each of which has been or will be rejected. These creditors will be treated in the same matter as unsecured creditors in Class 6 below. Class 5 is impaired and is entitled to vote.

**Class 6:** This Class consists of all unsecured claims. Each member holding an allowed claim will receive a distribution equal to 3% of its allowed claim within seven (7) years after the Effective Date. Installments shall be paid semi-annually. Each installment shall equal 1.5% of Hacketts' prior six months of revenue derived from sales of inventory. Notwithstanding, if any installment on account of an allowed unsecured claim would not exceed $10.00, such installment shall be deferred until the amount to be distributed to that creditor exceeds $10.00. If the members of this class are not paid in full through the semi-annual installments as provided in the Plan, the balance will be paid in a lump sum upon the seventh anniversary of the Effective Date. To the extent that any members of this Class have security interests in any real or personal property of Hacketts, such security interests shall be deemed terminated. Class 6 is impaired and entitled to vote.

**Class 7:** This Class consists of the Equity Interests of Hacketts' shareholder, Wisebuys, Inc. The sole holder of the Equity Interests shall receive no distribution under the Plan. Hacketts' shareholders shall retain their shares in the reorganized Debtor, but shall receive no distribution. Hacketts' sole shareholder will contribute $50,000 as new value for its shares in the reorganized Debtor. Class 7 is impaired and entitled to vote.

## ACCEPTANCE OR REJECTION OF THE PLAN

A. Voting Classes. Except as otherwise provided in the Plan or by order of the Court, each holder of a Claim in Classes that is not a Disputed Claim shall be entitled to vote to accept or reject the Plan, unless otherwise ordered by the Court.

B. Acceptance by Impaired Class. An impaired class of Claims shall have accepted the Plan if the holders (other than any holder designated under section 1126(e) of the Code) of at least two-thirds in amount and more than one-half in number of the holders of the Allowed Claims actually voting in such class have voted to accept the Plan.

C.    Nonconsensual Confirmation.  Hacketts requests that in the event any of the impaired classes reject the Plan, the Court confirm the Plan in accordance with section 1129(c) of the Code.

## MEANS OF IMPLEMENTATION
## OF THE PLAN

A.    Basis of Payment.  All payments made and funds anticipated to be distributed pursuant to the terms and provisions of the Plan and shall be derived from the revenues and income generated by the continued operation of Hacketts' operations as well as the capital contributions set forth above.

Cancellation of Existing Securities and Agreements.   On the Effective Date, any promissory notes and other instruments evidencing any Claim shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of Hacketts under the agreements, indentures and the certificates of designations governing such Claims, as the case may be, shall be discharged except for those documents evidencing the secured position of various creditors.

C.    Cash Payments.  Any payment made pursuant to the Plan may be made either in cash, by check drawn on a bank that is a member of the New York Clearing House Association or by wire transfer from such a bank, at the option of Hacketts.

D.    Saturday, Sunday or Legal Holiday.  If any payment, distribution or other act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payments or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

E.    Failure to Negotiate Checks, etc.  Checks and wire transfers issued in respect of distributions under the Plan shall be null and void if not negotiated or cleared within sixty (60) days after the date of issuance.  Thereafter, all Claims in respect of void checks and wire transfer

and the underlying distributions shall be discharged and forever barred from assertion against Hacketts and its property.

F. Tax Exemption. Transfers of any assets on or after the Effective Date shall be made pursuant to order of the Bankruptcy Court and, accordingly, to the fullest extent permitted by law, shall be exempt from all stamp taxes and similar taxes with the meaning of section 1146(c) of the Code.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

Except as otherwise expressly provided in the Plan, Hacketts intends to reject, or has rejected, each of the outstanding executory contracts and unexpired leases under which it was obligated or to which it was a party as of the Petition Date.

## MODIFICATION/REVOCATION OF THE PLAN

A. Modification. After confirmation of the Plan, Hacketts may alter, amend or modify the Plan in accordance with Section 1127 of the Code.

B. Revocation. Hacketts reserves the right to revoke and withdraw the Plan at any time prior to the Confirmation Date. If the Plan is so revoked or withdrawn or if the Effective Date does no occur, then the Plan shall be deemed null and void as it relates to Hacketts. In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against Hacketts or any other persons or to prejudice in to each claimant of money and/or other property at least equal in value to what the claimant would have received in a liquidation of Hacketts under Chapter 7 of the Code; (c) a finding by the Court that the Plan is feasible; and (d) with respect to each Class, either acceptance by that Class of a finding by the Court that the Plan is "Fair and equitable" and does not "discriminate unfairly" against that Class.

## WHO MAY VOTE

Only classes that are impaired under the Plan are entitled to vote on acceptance or rejection of the Plan. Generally, section 1124 of the Code provides that a class of claims or interests is considered impaired unless the allowed amount of claims is paid in full upon consummation of the Plan or a plan does not alter the legal, equitable, and contractual rights of the holder of the claim or interest. Only holders of allowed Classes two, three, four, five, six and seven claims are impaired and shall be entitled to vote on the Plan.

A Creditor is entitled to vote only if either (a) its Claim has been scheduled by Hacketts as not disputed, contingent or unliquidated, or (b) it has filed a proof of claim on or before the Bar Date set by the Court. Any Claim as to which an objection is pending is not entitled to vote unless the creditor has obtained an order of the Court temporarily allowing the Claim for the purpose of voting on the Plan. A Creditor's vote may be disregarded if the Court determines that such acceptance or rejection was not solicited or procured in accordance with the provisions of the Code.

The failure of Hacketts to object to a Claim prior to the Confirmation Hearing, and the counting of a ballot cast by the holder of such a Claim shall not preclude or waive the right of Hacketts to object to the Claim thereafter, as otherwise provided in the Plan.

## VOTING PROCEDURES

1.     Solicitation Period.

In order to be counted, a Ballot must be RECEIVED at the following address no later than 4:00 p.m. EST, on _____, 2011:

> Patrick Hackett Hardware Co.
> c/o Antonucci Law Firm, LLP
> Attorneys for Hacketts
> 12 Public Square
> Watertown, New York 13601

2. Ballots.

A Ballot is enclosed herewith for each holder of a Claim eligible to vote on the Plan, which will serve as the Ballot for indicating acceptance or rejection of the Plan pursuant to the requirements of sections 1125 and 1126 of the Code and Bankruptcy Rule 3018(c). Only Ballots with original signatures will be accepted. FAX BALLOTS WILL NOT BE ACCEPTED.

## CONFIRMATION OF THE PLAN

Under the Code, the following steps must be taken to confirm the Plan:

1. Confirmation Hearing.

Section 1129(a) of the Code requires the Court, after notice, to hold a hearing on confirmation of the Plan. The Court has scheduled the confirmation hearing for

_____, 201 at _____ a.m. in the United States Courthouse, 10 Broad Street, Utica, New York (the "Confirmation Hearing"). Section 1128(b) of the Code provides that any party in interest may object to confirmation of the Plan, regardless of whether such party is entitled to vote.

2. Objection to Confirmation.

The Court has directed that any objection to confirmation of the Plan must be in writing and filed with the Clerk of the Court and served upon the undersigned counsel so as to be received no later than 5:00 p.m. _____, 2010. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**UNLESS ANY OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT MAY NOT BE CONSIDERED BY THE COURT.**

3.    Requirements for Confirmation of the Plan.

At the Confirmation Hearing, the Court will determine whether the requirements of sections 1129(a) or 1129(b) of the Code have been satisfied, in which event the Court will enter an order confirming the Plan. These requirements are as follows:

a.    Best Interests Test

Confirmation of the Plan requires that with respect to the impaired classes of Creditors, each holder of an Allowed Claim in such classes has either accepted the Plan or will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount the holder would receive if Hacketts were liquidated under Chapter 7 of the Code. Hacketts submits that it has satisfied the "best interest test" for the reasons discussed above. Notably, as a result of continuing its business as a going concern, the general unsecured creditors will receive proceeds from Hacketts' future income. Under Chapter 7 liquidation, there would be no such future income and the real estate would be disposed of to satisfy only secured creditors and real property tax claims.

b.    Feasibility of the Plan

In order for the Plan to be confirmed, the Court must determine that it is feasible; that as a practical matter Hacketts has sufficient resources to meet its obligations under the Plan on a timely based on cash flow projections.

c.    Acceptance by Impaired Classes.

Section 1129(a)(8) of the Code generally requires that each impaired class must accept the Plan by the requisite votes for confirmation to occur. A class of impaired Claims will have accepted the Plan if a least two-thirds in amount and more than one-half in number of Allowed Claims actually voting in the class, and voting upon the plan, have accepted it. A class of Equity Interests will have accept the Plan if the holders of at least two-thirds in amount of such

- 30 -

Equity Interests who vote have accepted it. In the event any class of Claims or Equity Interest that is impaired under the Plan fails to accept the Plan by the minimum percent of votes, except as described below, Hacketts may seek either to modify the Plan or to confirm the Plan pursuant to the provision of section 1129(b) of the Code.

        d.      Fair and Equitable Test

The Court must determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against impaired dissenting classes of Claims.

With respect to an Unsecured Claim, "fair and equitable" means either: (a) the impaired unsecured creditor receives property of a value equal to the amount of its claim; or (b) the holders of claims that is junior to the claims of such dissenting class will not receive any property under the Plan.

With respect to the class of Equity Interests, "fair and equitable" means either: (a) each holder of an interest of such class receives or retains on account of such interest property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled or the value of such interest; or (b) the holder of any interest that is junior to the interest of such class will not receive or retain any property on account of such junior interest.

Based upon the distributions to be made to holders of Allowed Claims under the Plan, Hacketts submits that the Plan is fair and equitable.

## TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the Plan to Hacketts and holders of Claims and Equity Interests. The analysis contained herein is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Regulations promulgated and proposed thereunder, judicial decisions and published

administrative rulings and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations hereafter enacted or promulgated could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address foreign, state or local or other tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as taxpayers who are not U.S. domestic corporations or citizens or residents of the United States, S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers and tax-exempt organizations).

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED FROM THE IRS WITH RESPECT THERETO. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

Generally, the federal income tax consequences of the Plan to a creditor will depend upon several factors, but not limited to: (I) whether the Creditor's Claim (or portion thereof) constitutes a Claim for principal or interest;(ii) the type of consideration received by the Creditor in exchange for the Claim; (iii) whether the Creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); (iv) whether the Creditor has taken a bad debt deduction or worthless security deduction with respect to his Claim and (v) whether the Creditor receives distributions under the Plan in more than one (1) taxable year. CREDITORS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

Creditors Receipt of Cash. Creditors receiving solely cash in exchange for the Claims will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and each such Creditor's adjusted tax basis in the Claim. The amount realized will equal the amount of cash (or, in the case of marketable securities, the fair market value of such securities) to the extent that such consideration is no allocable to any portion of the Claim representing accrued and unpaid interest.

The character of any recognized gain or loss (i.e. ordinary income, or short term or long term capital gain or loss) will depend upon the status of the Creditor, the nature of the Claim in the Creditor's hands, the purpose and circumstances of its acquisition, the Creditor's holding period of the Claim, and the extent to which the Creditor previously claimed a deduction for the worthlessness of all or a portion of the claim.

A loss generally is treated as sustained in the taxable year for which there has been a closed and complete transition, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with

reasonable certainty whether or not such reimbursement will be recovered.

Creditors should consult with their own tax advisors as to the matters discussed in this section concerning character and timing of recognition of gain or loss. Because a loss will be allowed as a deduction only for the taxable year in which the loss was sustained, a Creditor that claims a loss in the wrong taxable year risks denial of such loss altogether. In the case of certain categories of Claims, consideration should be given to the possible availability of a bad debt deduction under section 166 of the Tax Code for a period prior to the Effective Date. In addition, a portion of any distributions received after the Effective Date may be taxed as ordinary income under the imputed interest rule.

Receipt of Interest. A portion of the consideration received by a Creditor in satisfaction of a Claim may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest. If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the Coeditor as interest income, except to the extent the creditor has previously reported such interest as income.

In the event that a creditor has previously reported the interest income, only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the Creditor in respect of the principal amount of the Claim. Such an allocation would reduce the amount of the gain, or increase the amount of the loss, realized by the Creditor with respect to the Claim. If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital loses may be deducted against ordinary income).

To the extent that any portion of the distribution is treated as interest, Creditors may be required to provide certain tax information in order to avoid the withholding of taxes. CREDITORS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE

FEDERAL INCOME TAX TREATMENT OF CONSIDERATION RECEIVED IN
SATISFACTION OF THEIR CLAIMS.

The foregoing is intended to be a summary only and not a substitute for consultation with
a tax professional. The federal, state, local and foreign tax consequences of the Plan are complex
and in, some respects, uncertain. Such consequences may also vary based upon the individual
circumstances of each holder of a Claim or Equity Interest. Accordingly, each holder of a Claim
or Equity Interest is strongly urged to consult with its own tax advisor regarding the federal,
state, local and foreign tax consequences of the Plan.

## RISK FACTORS

Distributions to creditors contemplated to be made under the Plan are contingent upon
many assumptions, some or all of which could prove to be invalid and preclude the Plan from
becoming effective or reduced the anticipated distribution to creditors.

The Plan is subject to approval by various classes of creditors entitled to vote under the
Code and ultimate confirmation of the Plan by the Court. No assurances can be provided that
creditors will vote in favor of the Plan or that the Court will approve the same.

Hacketts will remain in business. Hacketts believes that the reorganization of its debts
and its projected cash flow will result in sufficient profit to make payments provided by the Plan.
However, in the event that Hacketts is unable to generate sufficient revenues to maintain
profitability, Hacketts could default on its obligations under the Plan.

## UNITED STATES TRUSTEE FEES

Pursuant to statute, while in Chapter 11 proceedings Hacketts has an ongoing obligation
to remit quarterly administrative fees to the Office of the United States Trustee. Hacketts
acknowledges that the ongoing obligation to remit said quarterly administrative fees commences
at the date of the filing of the instant petition and continues beyond the date of Confirmation of

the Plan until such time as the Court grants a Decree of Substantive Consummation. The Plan provides for the payment of United States Trustee Fees pursuant to 28 USC 1930 until closure of the case.

Hacketts shall remit to the Office of the United States Trustee any and all quarterly administrative fees due up to, and including, the date of Confirmation with these fees to be paid within five (5) days following the date of Confirmation of the Plan. Additional administrative fees incurred to the Office of the United States Trustee incurred after the date of Confirmation, up to and including, the date of the issuance by the Court of the Decree of Substantial Consummation, shall be paid on a timely basis as they become due and in no event shall the Court issue a Decree of Substantial Consummation without said fees incurred post-confirmation having been paid in full.

## PROPERTY TO BE RETAINED OR SURRENDERED

Except as expressly provided in the Plan or Order confirming Plan, Hacketts shall retain all property of the bankruptcy estate as of the Effective Date, whether tangible or intangible, scheduled or unscheduled, choate or inchoate, whosesoever located, which property shall vest in Hacketts free and clear of all claims and interests of creditors pursuant to Code Section 1141.

## DISBURSING AGENT AND ESTABLISHMENT OF ACCOUNTS

Hacketts shall act as its own disbursing agent with respect to any payments due pursuant to the Plan. Hacketts may establish such accounts with such banks as in the exercise of business judgment Hacketts shall deem necessary and appropriate.

## EFFECTIVE DATE

The Effective Date of the Plan shall be the first day of the second month following the entry of an Order confirming the Plan and the expiration of any appeal period or of the final determination of any appeal, whichever occurs later. The Effective Date may be extended in the

discretion of the Court on motion by any party in interest. In the event the Effective Date is extended, the terms of the Plain shall not otherwise be altered and an extension of the Effective Date shall not be deemed a modification of the Plan unless the Court shall so determine. For purposes of this Disclosure Statement, Hacketts assumes the Effective Date of March 15, 2011.

## EXECUTION OF DOCUMENTS

Under the Plan, Hacketts is authorized to execute any and all documents necessary for the implementation of the provisions of the Plan, without further Court order, including such contracts or agreements as may be necessary to establish any modification of rights of claim holders or security interests as established by the terms of the Plan. All holders of claims or interests shall be required to execute such documents as Hacketts may reasonably require for the satisfaction of debts, liens, claims, and interests upon satisfaction of the terms of the Plan.

## RETENTION OF JURISDICTION

Pursuant to the Local Bankruptcy Rules for the Northern District of New York, the Bankruptcy Court shall retain jurisdiction until there is substantial consummation of the Plan. Except as otherwise expressly provided in the Plan, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for purposes of, sections 105(a) and 1142 of the Code and for, among other things, the following purposes:

A.     To hear and determine pending applications for the assumption, assignment, or rejection of executory contracts or unexpired leases, if any, and the allowance of Claims resulting there from;

B.     To determine any and all adversary proceedings, applications and contested matters pending on the Effective Date;

C.     To determine any and all applications initiated by Hacketts for the sale,

- 37 -

abandonment or others disposition of any assets;

      D.      To ensure the distributions to holders of Allowed Claims are accomplished as provided herein;

      E.      To hear and determine nay timely objections to Administrative Expense Claims filed including any objection to the classification of any Claim, and to allow or disallow and disputed Claim, in whole or in part;

      F.      To enter and implement such orders as any is appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacate;

      G.      To issue such order in aid of execution of the Plan, to the extent authorized by section 1142 of the Code;

      H.      To consider any modifications of the Plan, to cure and defects or omissions, or reconcile any inconsistency on the Plan or in any order of the Court, including, without limitation, the Confirmation Order;

      I.      To hear and determine all applications for compensation and reimbursement of expenses of professionals incurred prior to the Effective Date under sections 330, 331 and 503(b) of the Code;

      J.      To hear and determine disputes arising in connection with the interpretation or enforcement of the Plan, including issues relating to releases, injunctions and discharge granted hereunder;

      K.      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Code; and

      L.      To enter a final decree closing the Chapter 11 Case.

## DISCHARGE ORDERS

Pursuant to Bankruptcy Code Section 1141(d)(1) confirmation of this Plan will

discharge Hacketts from any debt that arose before the date of confirmation of the Plan whether or not the creditor or party in interest has filed a proof of claim based on such debt. The failure of a creditor to file a proof of claim with the Court will not accept the said debt from discharge. Further, if the Plan is confirmed, this discharge will be in effect as to creditors whether the creditor has voted to accept the plan; voted to reject the plan; or not voted at all.

## CONFIRMATION STANDARDS

Hacketts believes that the provisions of the proposed Plan of Reorganization comply with the mandatory requirements set forth under Code Section 1129(a)(1) through (a)(13). With respect to the provisions of Code Section 1129(a)(8) and 1129(a)(10), Hacketts believes that at least one class of impaired claims will vote to accept Hacketts' Plan. Therefore, Hacketts believes that the requirements of acceptance of each class of claims set forth in Bankruptcy Code Section 1129(a)(8) may be subject to cram-down provisions set forth in Bankruptcy Code Section 1129(b).

In the event Hacketts is required to proceed to confirmation by cram-down in accordance with the Local Rules of the Court, Hacketts believes that cram-down will be approved in that the liquidation analysis establishes Hacketts' compliance with the liquidation standards for cram-down and the proposed income for the purpose of debt repayment under the circumstances. Hacketts incorporates herein by reference all Monthly Operating Reports filed with the Office of the United States Bankruptcy Court Clerk for the Northern District of New York during the pendency of this proceeding.

## CONCLUSION

Hacketts urges all holders of Claims to accept the Plan. Hacketts affirms that each of the provisions and terms of the Plan have been reviewed by Hacketts and its sole officer, director and shareholder. That each such party has found the Plan to be fair, reasonable and feasible, and as such, management of Hacketts has been authorized by the sole officer, director and shareholder to file the accompanying proposed plan of reorganization of Hacketts.

Dated: December 8, 2010

Antonucci Law Firm LLP

By:_____
David P. Antonucci Esq.
Bar Roll No. 101041
Attorneys for Hacketts
Office and P.O. Address
12 Public Square
Watertown, New York 13601

Respectfully submitted
Patrick Hackett Hardware Company

By:_____
Thomas Scozzafava, Chairman of the Board